STATE of Wisconsin, Plaintiff-Respondent,

v.

Dennis VAN STRATEN,† Defendant-Appellant.

Court of Appeals

*No. 86–1669–CR. Submitted on briefs February 5, 1987.—
Decided May 26, 1987.*

(Also reported in 409 N.W.2d 448.)

† Petition to review denied.

For the defendant-appellant, there were briefs submitted by *Jack E. Schairer* and *Mary E. Waitrovich,* assistant state public defenders, of Madison.

For the plaintiff-respondent, there was a brief submitted by *Bronson C. La Follette* and *Thomas J.*

*Balistreri,* attorney general and assistant attorney general of Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Dennis Van Straten appeals a judgment convicting him of armed burglary and possession of burglarious tools,[1] as well as an order denying postconviction relief. Van Straten argues that the questions posed to potential jurors during voir dire biased the jury against him; that the state improperly cross-examined alibi witnesses at trial; that the trial court erroneously admitted certain rebuttal testimony; that his trial counsel ineffectively represented him; and that he deserves a new trial in the interest of justice. We conclude that the trial court properly exercised its discretion in conducting voir dire, that any errors committed at trial were harmless, and that Van Straten's trial attorney adequately represented him. Accordingly, he is not entitled to a new trial in the interest of justice. We therefore affirm the trial court's judgment and order.

Shortly after 1 a.m. on June 2, 1985, Appleton police received a silent automatic alarm originating from a local Dairy Queen store. In less than a minute, two officers arrived on the scene. While his partner approached the front of the store, Officer Michael Parker ran around to the back. As Parker approached the rear door, a person burst from the store and sprinted toward a fence bordering the store's parking lot. The suspect ignored Parker's order to stop and collided with the fence while attempting to leap over it. The suspect then turned partially toward Parker,

---

[1] *See* secs. 943.10(1)(a), 943.10(2)(a), and 943.12, Stats.

regained his footing and, as he scrambled over the fence, turned to face Parker again.

Parker had pursued the suspect, but was unable to apprehend him before he escaped over the fence. He did, however, observe the suspect's appearance and gave a description to the other officers who had arrived at the scene. He told them that the suspect had been wearing a black leather jacket, light blue pants, and athletic shoes. The suspect had appeared to be about five feet, nine inches tall, and had well-groomed brown hair. Within minutes of the original sighting, the police began to search the area near the store.

After about ten minutes, another officer noticed a short trail of matted grass leading from the other side of the store's fence into an adjacent vacant field. At the end of the trail, the officer found Van Straten lying face down in the knee-high grass. The officer informed Van Straten that his weapon was drawn, but Van Straten began to sit up. The officer ordered him to return to his original position, but Van Straten remained sitting and replied, "Shoot me." Van Straten, who was approximately six feet tall, was wearing a black leather jacket, light blue pants, athletic shoes and gloves, and had well-groomed brown hair. He was wearing gloves although the temperature that night was about sixty degrees. Parker then arrived and identified Van Straten as the suspect that he had seen fleeing the store.

Investigators found a kitchen knife, flashlight, and tire iron at the base of the fence bordering the store's parking lot. They also found that the store's rear door had been forced open and that a large number of paint and plaster chips as well as wood splinters had been created in the process. Detectives

found a small piece of metal on the floor at the base of the door that matched a piece missing from the tire iron found near the fence. A shoe print found on a piece of cardboard that had been lying inside the door was found by the state crime lab to be consistent with the shoes Van Straten was wearing that night. The crime lab determined that pieces of paint and plaster found on the clothes Van Straten was wearing that night precisely matched paint samples taken from inside the store. These samples were inconsistent with samples later taken with Van Straten's consent from the inside of his apartment.

After his arrest, Van Straten was held on a $10,000 bond in the Outagamie County Jail. While awaiting trial, he attempted suicide. The jailers who initially responded to the emergency were spattered with blood while attempting to stop his bleeding. Van Straten was then taken to a local hospital where he received more than forty stitches for self-inflicted wounds to his wrist and forearm. While Van Straten was being treated, a female friend of his was arrested at the hospital, carrying a small-caliber revolver. She apparently admitted that she was going to help Van Straten escape.

Immediately after the incident, Van Straten was sent to the Winnebago Mental Health Institute for observation. While at Winnebago, and because he had been feeling ill for several months, Van Straten requested and received a preliminary test for exposure to the AIDS virus. The results were positive. This development triggered fears that the jailers who had interceded in Van Straten's suicide attempt had been exposed to the deadly virus because of their contact with Van Straten's blood. The revelation that Van Straten had been exposed to AIDS and the possibility

that he had infected his jailers generated state-wide media coverage of the jail incident. The record includes several newspaper articles as well as references to related stories broadcast over television and radio.

The initial newspaper reports of the incident did not identify Van Straten by name but referred to him only as a prisoner in the Outagamie County Jail. They stated, however, that this prisoner had tested positive for exposure to the AIDS virus, that he was homosexual, that the suicide attempt had been faked, that the prisoner had "slashed his wrists and squirted blood on [the jailers]," and that a female friend had been arrested carrying a handgun at the local hospital. A November 14, 1985, article in the Milwaukee Sentinel quoted the Outagamie County sheriff as saying:

> [The jailers] ... came in personal contact with his [the prisoner's] wounds and had blood squirted at them, including toward their mouths.
>
> ....
> [The suicide attempt] was a phony anyway, ... It was actually a jailbreak attempt. ... [The prisoner's female friend] said she was going to "smoke" two of my officers.
>
> ....
> He is the worst prisoner I have ever had in this jail, ... He spits at the guards, and has told this one ... that if he ever comes back here, he is going to kill him.

The Appleton Post-Crescent published an article on the incident naming Van Straten and stated that, "Van Straten sprayed blood on jailers during a suicide attempt." Another Post-Crescent article quoted one of the jailers as saying, "He was forcing the blood out of his arm and onto us." Several days after widespread media reports of the incident, Van Straten himself

called the Post-Crescent to refute the claims that he had intentionally squirted blood at the officers. The Post-Crescent reported Van Straten's rebuttal and published his name in the story.

Before jury selection for Van Straten's armed burglary trial began, the trial court noted that Van Straten had been linked, in extensive pretrial publicity, to AIDS, homosexuality, and the jailhouse attempted suicide incident. The trial court reasoned that

> while the jurors know Dennis Van Straten they may very well say they don't, they know the name, read about some articles in connection with AIDS, which purportedly Dennis has, and also there might be an issue with regard to homosexuality that might arise, if not at the outset, then at a later point in the proceedings, so that it was my view that inference inquiry should be made of the jury with regard to any feelings or attitudes they may have with regard to AIDS and also with regard to homosexuality, and so that I concluded that inquiry should be made at the outset during the voir dire, and I propose that with regard to those issues, that inquiry should be made on the jurors four at a time here in chambers....

During voir dire, the court, the prosecutor, and Van Straten's attorney extensively questioned groups of four jurors regarding what had been revealed in media coverage of the suicide attempt incident. The questions repeated the media versions of the suicide attempt and identified Van Straten as the subject of the stories. The questioning also revealed that Van Straten was homosexual and possibly bisexual. Accordingly, the questions explored the prospective jurors' prejudices regarding sexual preference. During the in-chambers questioning, several prospective ju-

rors revealed that they would be unable to be impartial in such a case. One, in fact, revealed that he thought all homosexuals "should be stoned." This juror and several others were excused for cause. Most of the jurors revealed at least some knowledge of the pretrial publicity but, after detailed questioning, satisfied the court, the prosecutor, and Van Straten's attorney that they would be impartial.

A two-day trial followed the jury selection. Van Straten was found guilty of armed burglary and possession of burglarious tools.

Van Straten first argues that the extensive voir dire concerning AIDS, homosexuality, and the suicide attempt served to introduce prejudice where none had existed before, poisoned the jury against him and, accordingly, denied him a fair trial. We disagree.

Under the United States and Wisconsin Constitutions, a criminal defendant is guaranteed an impartial jury. *Hammill v. State,* 89 Wis. 2d 404, 407, 278 N.W.2d 821, 822 (1979). Due process principles likewise guarantee a defendant a fair trial by a panel of impartial jurors. *Id.* at 408, 278 N.W.2d at 822. The selection of an impartial jury is conducted under the trial court's supervision, and voir dire is a matter left to the trial court's sound discretion. *Id.* The trial court's discretion extends to the form and number of questions posed to potential jurors. *Id.* The exercise of this discretion is subject to the "essential demands of fairness." *Id.* We will not disturb the exercise of such discretion unless it is abused or violates a rule of law. *Id.* at 408, 278 N.W.2d at 822–23.

██

The trial court should act on its own motion when confronted with aggravated circumstances, such as

the pressure of publicity surrounding the case, that render a jury's dispassionate evaluation of the evidence doubtful. *State v. Dean,* 67 Wis. 2d 513, 526, 227 N.W.2d 712, 718 (1975), *cert. denied,* 423 U.S. 1074 (1976). To offset possible prejudice created by pretrial publicity, a court may use voir dire to identify and exclude prospective jurors who are prejudiced. *Id.* at 527, 227 N.W.2d at 719. When considering the effect of publicity on prospective jurors, the court must look to the nature and content of the publicity. *Id.*

In *Dean,* the defendant had been accused of murdering his mother, his girlfriend's mother, and three of his girlfriend's young brothers. The defendant claimed that he had been under the influence of LSD and could not remember killing anyone. The *Dean* court noted the substantial amount of local news coverage that naturally accompanied this incident, but concluded that the local media stories were "straight and factual and not incendiary." *Id.* at 527, 227 N.W.2d at 719. Accordingly, the court determined that the trial court had not abused its discretion by failing to order a change of venue and denying a defense motion for individual voir dire of prospective jurors. *Id.* at 527–28, 227 N.W.2d at 719.

Here, the trial court faced a much different situation. The media coverage involving Van Straten touched on controversial issues that were irrelevant, or at best merely tangential, to a routine armed burglary trial. The court noted, and neither party contests, that the issues of AIDS, homosexuality, and the stories of an attempted jailbreak involving an alleged attempt to squirt AIDS-infected blood at jailers, touch on generally widespread societal fears and prejudices. Without judging the accuracy of the reports of Van Straten's suicide attempt, it is clear

that the incident was widely known and was the type of story that could incite intense prejudicial feelings against the defendant.

Here, a change of venue may not have been useful in the face of state-wide publicity. A continuance may or may not have defused pretrial publicity. Thus, the trial court had no alternative but to employ an effective voir dire to insure an impartial jury. The court expressed fear that even though some of the panel may not have immediately connected Van Straten's name with the widespread stories involving the so-called "AIDS Prisoner," the realization that Van Straten was this prisoner would have come upon them at trial or during deliberations. In light of the extensive pretrial media coverage, we conclude that this fear was well-founded. A jury chosen by a general voir dire for its professed inability to connect Van Straten with the media coverage could be easily poisoned were a member suddenly to realize that Van Straten had been the stories' subject. Such a realization would have been made more probable by large numbers of reporters at a routine burglary trial.

Based on this reasoning, the trial court chose to question four panel members at a time, in chambers, in the hope that they would candidly reveal any prejudices against a homosexual AIDS victim who had allegedly sprayed his infected blood at his jailers. The record supports the trial court's reasoning. Several panel members professed an inability to fairly decide the burglary issue in light of what they had heard about Van Straten. The remaining panel members, under careful and detailed questioning, stated that they would be able to consider Van Straten's innocence or guilt on the burglary charges independent of collateral matters. The fact that several jurors admit-

ted their bias compels us to conclude that the remaining panel members honestly professed their ability to be fair. *See State v. Herrington,* 41 Wis. 2d 757, 765–66, 165 N.W.2d 120, 123–24 (1969).

Van Straten contends, however, that a general voir dire would have been more appropriate. We disagree. Those jurors who admitted irreconcilable prejudice against homosexuals, for instance, would not have been excluded under general questioning regarding pretrial publicity. The probability of a biased jury would have been increased, not decreased, had these panel members not been excluded.

Accordingly, we conclude that, in the face of unusual and substantial pretrial publicity, the trial court properly exercised its discretion in determining the form, nature, and number of questions asked during voir dire. Under the circumstances, the trial court had little choice but to reveal Van Straten's connection with the widespread prejudicial accounts of the "AIDS Prisoner." In carefully questioning the panel, and excluding all but those who satisfied all the parties of their ability to be fair, the trial court guaranteed Van Straten an impartial jury.

Because we have determined that the voir dire was appropriate under the circumstances, we reject Van Straten's argument that his trial counsel ineffectively represented him by failing to object to the voir dire and by participating in the questioning.

Van Straten next argues that the trial court improperly allowed the prosecutor to cross-examine alibi witnesses about alleged attempts by a third party not linked to Van Straten to solicit perjured testimony. He contends that the state had no factual predi-

cate for the accusations implied in the questions. We reject this argument.

At trial, Van Straten produced two witnesses who testified that he had been at a nearby tavern with them until just before the burglary attempt. These witnesses further testified that Van Straten had been extremely intoxicated. Van Straten's defense turned on his claim that he had left the tavern, after becoming ill, to walk to his apartment to get jumper cables to help the two friends start their car. Van Straten claimed that rather than returning to his apartment, he walked into a vacant field, became ill, and passed out. The next thing he claims to remember is being apprehended in the field. The prosecution attempted to impeach these witnesses on cross-examination by inquiring whether their testimony had been influenced by Dave Johnson, Van Straten's roommate and homosexual lover.

The state may cross-examine on such a subject if it reasonably suspects that the circumstances giving rise to the question may be true. *See State v. Williamson,* 84 Wis. 2d 370, 380–81, 267 N.W.2d 337, 342 (1978). The state presented evidence that Johnson had approached the bartender at the tavern Van Straten claimed to have been at on the night of the burglary. Johnson showed the bartender a photograph of Van Straten and asked him to testify falsely that he had seen him at the tavern that night. Johnson was closely acquainted with one of the two alibi witnesses and knew both had been at the tavern that night. Thus, the state had reason to suspect that Johnson had also attempted to influence the alibi witnesses.

Moreover, such questioning must be shown to be prejudicial. *Id.* at 380, 267 N.W.2d at 342. The test of

318

harmless error is not whether some harm has resulted but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than the purportedly inadmissible evidence, that would convict the defendant beyond a reasonable doubt. *Dean,* 67 Wis. 2d at 533, 227 N.W.2d at 722. Here, the circumstantial evidence of Van Straten's guilt was overwhelming. The versions of facts provided by Van Straten's alibi witnesses did little to help Van Straten. Both witnesses testified that Van Straten left the tavern between 12:30 and 12:45 a.m. The store alarm registered at 1:06 a.m., and the Dairy Queen and Van Straten's next-door apartment were only several blocks from the tavern. Further, the police found no evidence that Van Straten had vomited or passed out in the field. His clothes were clean, and he was able to get up as soon as he was discovered. We conclude that evidence independent of that implied by the state's cross-examination established Van Straten's guilt beyond a reasonable doubt.

Van Straten also argues that the state's presentation of the bartender's testimony on rebuttal was improper. The testimony was not, however, introduced to show that Van Straten had asked Johnson to solicit perjury. The evidence was admitted to impeach the credibility of Van Straten's alibi witnesses. This is a proper subject for rebuttal testimony. *See Rausch v. Buisse,* 33 Wis. 2d 154, 167, 146 N.W.2d 801, 808 (1966). Even if erroneously admitted, the testimony was not prejudicial for the same reasons that the questioning of the alibi witnesses was not prejudicial. Other evidence of Van Straten's guilt was overwhelming.

Next, Van Straten argues that he received ineffective assistance of counsel at trial. We have already disposed of the argument that his counsel was ineffective at voir dire. However, Van Straten contends that his trial attorney also demonstrated ineffectiveness by failing to consult with Van Straten concerning a lesser-included offense instruction, failing to propose that instruction, and by waiving Van Straten's speedy trial request without first consulting him. We also reject these arguments.

In order to show ineffective assistance of counsel, Van Straten must demonstrate that: 1) His attorney's conduct was deficient, and (2) he was prejudiced by the deficient performance. *State v. Pitsch,* 124 Wis. 2d 628, 633, 369 N.W.2d 711, 714 (1985). In demonstrating deficient performance, a party must show that counsel's errors were so serious as to deny the party a trial whose result is fair and reliable. *Id.* at 640–41, 369 N.W.2d at 718.

Van Straten argues that a lesser-included offense instruction for unarmed burglary should have been given. Such an instruction should only be submitted to the jury when there is a reasonable basis in the evidence to convict a defendant of the lesser offense and to acquit him or her of the greater offense. *State v. Mendoza,* 80 Wis. 2d 122, 150–51, 258 N.W.2d 260, 272 (1977). Van Straten has failed to show a basis for giving the lesser-included offense instruction. The weapon was discovered with the tire iron and flashlight that were linked to Van Straten. No reasonable jury, finding that Van Straten had used the tire iron and flashlight to commit the burglary, could have found that he was not also carrying the knife.

Van Straten also contends that his trial counsel was ineffective because he did not advise him of the waiver of his speedy trial request. Van Straten's attorney waived the speedy trial request because Van Straten himself had requested that paint samples from his apartment be compared with the paint chips found on his clothes the night of the burglary. Because of what Van Straten told him, the attorney believed the crime lab evidence would be exculpatory. Van Straten's attorney testified that although he did not consult with his client specifically on the speedy trial issue, his client knew that the crime lab tests would not be completed until after the initial trial date. We conclude that Van Straten was not prejudiced by his attorney's conduct. Given Van Straten's insistence that they be made, the attorney cannot be blamed for the adverse effect of the crime lab tests.

■

Finally, Van Straten argues that he deserves a new trial in the interest of justice. *See* sec. 752.35, Stats. We have already concluded that voir dire produced an impartial jury and that the conduct of the trial did not prejudice Van Straten. We therefore conclude that justice does not compel a new trial.

*By the Court.*—Judgment and order affirmed.