### STATE OF CONNECTICUT *v.* EUGENE MERCER
### (12931)

PETERS, C. J., HEALEY, SHEA, COVELLO and HULL, Js.

Argued April 13—decision released June 21, 1988

*Paul F. Thomas,* special public defender, for the appellant (defendant).

*Harry Weller,* deputy assistant state's attorney, with whom, on the brief, were *Eugene Callahan,* state's attorney, and *Bruce Hudock,* assistant state's attorney, for the appellee (state).

*Shelley Geballe* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

PETERS, C. J. The central issue in this appeal is whether the trial court violated the defendant's constitutional right to a fair trial by disclosing to all prospective jurors, prior to voir dire, that the defendant had Acquired Immune Deficiency Syndrome (AIDS).[1] The defendant, Eugene Mercer, was found

---

[1] The defendant was diagnosed as having AIDS related complex (ARC). The trial court, however, informed venirepersons that he had AIDS.

The precise issue in this case is unlikely to arise again since this court has promulgated guidelines for the treatment of persons with AIDS. The guidelines provide: "POLICY REGARDING ACQUIRED IMMUNODEFICIENCY SYNDROME (AIDS).

"1. No restrictions may be placed on a person's employment in the Superior Court solely on the basis of a Diagnosis of AIDS (Acquired Immunodeficiency Syndrome), or ARC (AIDS Related Complex), or a positive HTLV-III/LAV (human T-cell lymphotrophic virus type III/lymphodenopathy-associated virus) antibody blood test, provided the employee's health status enables the employee to perform duties [of] employment. However, Department Heads may modify the duties of any employee based on (1) medical recommendations which are consistent with managerial prerogatives or (2) laws and regulations concerning communicable diseases.

"2. With respect to the activities and conduct of non-employees (jurors, attorneys, criminal defendants, parties to civil litigation, witnesses, juvenile detainees, visitors to a courthouse) in a facility of the Judicial Department, no special treatment (privilege or restriction) may be ordered solely on the basis of a diagnosis that the non-employee has AIDS, ARC, or a positive HTLV-III/LAV antibody blood test, unless it is based on a recommendation of a physician or is required to allow the Department to comply with a law or regulation concerning communicable diseases.

"3. There shall be no testing of present or prospective employees for determining the presence of the HTLV-III/LAV antibody.

"4. Although it is recognized that no special precautions are necessary to prevent the transmission in the workplace of HTLV-III/LAV, the virus that causes AIDS, employees who may come in contact with blood or other body fluids should comply with . . . [established] procedures for preventing the transmission of *any* infectious germ. . . .

"It is understood: that the Judicial Department is offering education regarding AIDS to all employees and specific training to those who may come in contact with blood or other body fluids; that protective equipment and masks will be purchased for use in administering CPR; and that the Chief Court Administrator will appoint an oversight committee to monitor compliance with the Department's policy and the provisions of this paragraph and to work with other departments, such as the sheriffs, in implementing this plan." (AIDS Guidelines for the Connecticut Supreme Court announced on November 16, 1987, by Chief Justice Ellen A. Peters).

guilty of felony murder in violation of General Statutes § 53a-54c[2] by a jury of twelve. He appeals from the ensuing judgment sentencing him to a term of imprisonment of forty-five years.

The jury could reasonably have found the following facts: On the morning of December 12, 1984, the victim parked her car in the parking lot of the building where she worked in Stamford. As she got out, the defendant, who had been standing nearby, pulled out a gun and said "Lady, I want the keys." The victim began to walk away and the defendant shot her in the head. When she collapsed, the defendant ran toward her, took her keys, jumped into her car and sped away. The victim subsequently died from the gunshot wound.

On appeal, the defendant claims that the trial court erred in: (1) informing the prospective jurors prior to voir dire that he was suffering from AIDS; (2) failing to suppress a statement he made to the police; and (3) instructing the jury on the standard of proof applicable to circumstantial evidence. We conclude that the trial court did not commit reversible error.

---

[2] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

I

The defendant raises two related claims with respect to the AIDS issue. His principal argument is that the trial court's disclosure to all prospective jurors that he suffered from AIDS deprived him of his right to a fair and impartial jury under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. His secondary argument is that the trial court's subsequent dismissal for cause of all jurors who indicated doubt about their impartiality or their fear of contagion violated his right to individual voir dire under amendment four to the Connecticut constitution.

The record reveals the following chronology of events: On August 6, 1986, the trial court, sua sponte, ordered a hearing on the defendant's medical condition. The record does not disclose how this issue came to the court's attention or what prompted it to order the hearing.[3] The focus of the hearing was the risk of contagion to other persons, and in particular to the jurors, created by the defendant's presence in the courtroom during trial. Dr. Edward Blanchette, the medical director at the Connecticut Correctional Institution, Somers, testified that the defendant was suffering from AIDS related complex (ARC). According to Blanchette, the defendant was infected with HTLV-III, the virus associated with AIDS, but had not developed the symptoms marking the onset of full-blown AIDS. In response to repeated questioning by the court, Blanchette assured it that it could "100 percent guarantee" to the jurors that the defendant's condition presented no risk of contagion to them. At no time during the proceedings did the defendant complain of the public nature

---

[3] At least one article regarding the defendant's medical condition, however, had earlier appeared in the press. See "Murder Suspect with AIDS may see his trial on TV," Stamford Advocate, August 2, 1985, p. 1.

of this proceeding, nor does he now, on appeal, raise any issue about its propriety.[4]

Thereafter, as each panel of venirepersons was sworn in, the trial court informed the prospective jurors that the defendant was suffering from AIDS. On all three occasions, the court then summarized Blanchette's testimony and emphasized that the defendant's presence created no risk of contagion to them.[5] It next inquired whether the defendant's illness would affect any juror's ability to be fair and impartial or whether any juror would prefer not to sit in the case for fear of contracting AIDS. The trial court dismissed for cause all potential jurors, a total of twenty-one in number, who answered either question affirmatively.[6] In addition, during voir dire almost all the potential jurors were further questioned by the attorneys about their views on AIDS and any who expressed doubt about their ability to be impartial or a fear of contagion were dismissed for cause. The defendant never objected to this procedure.[7]

Because of this procedural default at trial, the state contends that we should not address the merits of the defendant's claim that the trial court violated his right

---

[4] The amici, Connecticut Civil Liberties Union Foundation et al., argue that the hearing and the trial court's subsequent revelations violated the defendant's constitutional rights to privacy and equal protection. Although we recognize the significance of this claim, we decline to review it as the defendant does not distinctly raise it himself. *Simons* v. *Canty,* 195 Conn. 524, 529 n.8, 488 A.2d 1267 (1985).

[5] On one occasion, the trial court raised the issue at the prompting of both counsel.

[6] The first time, the trial court dismissed jurors who indicated an inability to be impartial or a fear of AIDS after an off-the-record discussion with counsel.

[7] On August 12, 1985, the defendant moved to dismiss the prosecution on the ground of prejudicial publicity. This motion, which the trial court subsequently denied, claimed that the state's attorney's office had engendered prejudicial pretrial publicity by releasing information concerning the defendant's health. The defendant has not, on appeal, pursued any issue relating to denial of this motion.

to a fair trial. We have, however, regularly held that we will review a claim raised for the first time on appeal if it implicates a fundamental constitutional right and is adequately supported by the record. *State* v. *Torrence,* 196 Conn. 430, 435, 493 A.2d 865 (1985); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). The state misses the point when, conceding that the defendant raises a constitutional claim, it maintains nonetheless that the record does not clearly demonstrate that the defendant was denied a fair trial. By focusing on the ultimate merits of the defendant's claim, the state misconstrues the nature of *Evans* review. Whether a claim "qualifies for review under *State* v. *Evans,* [supra], invariably precedes our consideration of the merits of the defendant's claim." *State* v. *Robinson,* 204 Conn. 207, 210 n.4, 527 A.2d 694 (1987). We conclude that this defendant is entitled to have us consider the merits of his constitutional claim.

## A

The defendant's principal attack focuses on the trial court's alleged error in gratuitously disclosing his medical condition to prospective jurors prior to voir dire. He contends that this information, which was extraneous to the question of his innocence or guilt, inherently prejudiced the jury against him. According to him, the statement that he had AIDS implied to the jurors that he was a homosexual or an intravenous drug user, suggesting in either case that he had a widely condemned life-style. He further argues that because of the hysteria surrounding the transmission of AIDS, the court's revelation engendered great anxiety among the jurors, which inevitably tainted the verdict. Although the court's disclosure may have been intended to minimize the prejudice engendered by adverse pretrial publicity surrounding the case, he maintains that the court's actions made matters worse: by dismissing all jurors who expressed hesitation in the presence of the

remainder of the panel, the court legitimized AIDS-related fear and discrimination. As a result, he contends that the jury that convicted him could not have been impartial. We are not persuaded.

In constitutional terms, the defendant's argument is essentially that the trial court, by exposing the jury to inflammatory and extraneous information, denied him the presumption of innocence, a component of the right to a fair trial. Although the conduct of voir dire is within the broad discretion of the trial court; *State* v. *Fritz,* 204 Conn. 156, 161, 527 A.2d 1157 (1987); that discretion must be exercised within the parameters established by the right to a fair trial. *State* v. *Marsh,* 168 Conn. 520, 522, 362 A.2d 523 (1975). With regard to claims of jury prejudice, the United States Supreme Court has emphasized: "The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. . . . Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." (Citations omitted.) *Estelle* v. *Williams,* 425 U.S. 501, 504, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976). Due to the serious constitutional implications of the defendant's claim, we "have the duty to make an independent evaluation of the circumstances." *Sheppard* v. *Maxwell,* 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *State* v. *Marra,* 195 Conn. 421, 428, 489 A.2d 350 (1985); *State* v. *Piskorski,* 177 Conn. 677, 685–86, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

Our review of the defendant's claim is guided by the principles of law applicable to claims of jury bias resulting from prejudicial publicity. In evaluating such claims,

we have recognized, following the United States Supreme Court, two types of situations. In ordinary circumstances, a defendant must show " 'a connection between the publicity . . . and the existence of actual jury prejudice.' " *State* v. *Piskorski,* supra, 689; see *Estes* v. *Texas,* 381 U.S. 532, 542, 85 S. Ct. 1628, 14 L. Ed. 2d 543, reh. denied, 382 U.S. 875, 86 S. Ct. 18, 15 L. Ed. 2d 118 (1965). A showing of actual prejudice is, however, excused " ' "in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable." ' " *State* v. *Marra,* supra, 428–29; *State* v. *Piskorski,* supra; see *Estes* v. *Texas,* supra, 542–43.

The United States Supreme Court has found publicity surrounding a trial inherently prejudicial in *Rideau* v. *Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), *Estes* v. *Texas,* supra, and *Sheppard* v. *Maxwell,* supra. *Rideau* v. *Louisiana* involved the repeated television broadcast of the defendant's confession to murder in the community in which the crime and trial took place. The court observed: "For anyone who has ever watched television the conclusion cannot be avoided that this spectacle . . . in a very real sense was Rideau's trial . . . . Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Rideau* v. *Louisiana,* supra, 726. Treating the presumption of prejudice as essentially irrebuttable, the court declined to evaluate the voir dire examination of the jurors to determine whether they had actually been prejudiced. Id., 727. In *Estes* v. *Texas,* the United States Supreme Court presumed the existence of prejudice from the "circus atmosphere" of the trial, created by the intrusive presence of the press. See *Murphy* v. *Florida,* 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975). Likewise, in *Sheppard* v. *Maxwell,* supra, 355, the court

reversed the petitioner's conviction where "bedlam [had] reigned at the courthouse during the trial and newsmen [had taken] over practically the entire courtroom, hounding most of the participants in the trial, especially [the petitioner]." The court, however, has subsequently emphasized that exposure to prejudicial information does not presumptively deprive a defendant of due process. *Murphy* v. *Florida,* supra.

The question before us therefore is whether the likelihood of prejudice in this trial was so great as to raise an irrebuttable presumption of prejudice. We conclude that no such showing has been made. Unlike the circumstances of *Estes* v. *Texas* and *Sheppard* v. *Maxwell,* the record in this case does not indicate that the trial atmosphere was "utterly corrupted" by the disclosure that the defendant supposedly had AIDS. See *Murphy* v. *Florida,* supra. In evaluating the effect of the disclosure, we consider one factor, the defendant's failure to object, of particular significance. In *Rideau* v. *Louisiana,* supra, 724, *Estes* v. *Texas,* supra, 537, and *Sheppard* v. *Maxwell,* supra, 348–49, the defendants repeatedly raised to the trial court, by way of motions for change of venue and other means, the problem of prejudicial publicity. Here, in contrast, the defendant's failure to complain of the trial court's disclosure essentially represented acquiescence in its actions. Implicit in such acquiescence was his perception that the court's manner of proceeding would lessen rather than increase whatever prejudice resulted from the previous public disclosure of his condition. Lastly, we note, on the basis of the record before us, that the issue of the defendant's medical condition did not again arise during the trial.[8]

---

[8] The defendant likens the disclosure of his medical condition to the requirement, disapproved of in *Estelle* v. *Williams,* 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976), that a defendant wear prison attire throughout the

In less extreme cases, the United States Supreme Court has reviewed the "totality of the circumstances" to determine whether a defendant's trial was fundamentally fair. *Murphy* v. *Florida,* supra, 799. Accordingly, while the trial court's disclosure in this case that the defendant supposedly had AIDS created the distinct risk of prejudice, we consider the totality of the circumstances to determine whether the jurors were in fact biased against the defendant. Of particular importance in our inquiry is the conduct of the voir dire. Cf. *Murphy* v. *Florida,* supra, 800–803; *State* v. *Marra,* supra, 431–36. "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez* v. *United States,* 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981).

In the instant case, the trial court set no limits on the individual voir dire with regard to questions regarding the defendant's condition. Prospective jurors who expressed any concern about the contagiousness of AIDS or doubts about their ability to be impartial due to the defendant's condition were immediately dismissed for cause. In addition, both parties were granted additional peremptory challenges. At the time that the jurors who ultimately convicted the defendant had been selected, the defendant had not exhausted his challenges. "Unless all his peremptory challenges have been exercised before the completion of jury selection, it is presumed that no juror was permitted to serve

trial. There the United States Supreme Court noted: "The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." Id., 505. Due to the defendant's failure to raise the issue at trial, however, it declined to reverse his conviction. Id., 512–13; see also *State* v. *Williamson,* 206 Conn. 685, 704–706, 539 A.2d 561 (1988). From our review of the record before us, we conclude that the disclosure of the defendant's condition prior to voir dire did not present an unacceptable risk of impermissible factors coming into play.

whom the defendant regarded as biased or unsuitable, although he might have preferred others." *State* v. *Vitale,* 190 Conn. 219, 225, 460 A.2d 961 (1983).

Moreover, review of the voir dire of the jurors who found the defendant guilty leads us to conclude that they were not biased against him because of his medical condition. Several volunteered that they believed that the issue was wholly irrelevant to the question of the defendant's guilt. One juror expressed sympathy toward the defendant. Another pointed out that the defendant's condition presented a greater risk to himself than to the jurors. Defense counsel chose not to pursue further the state of mind of a third juror, who, while asserting that the defendant's illness was not a factor, admitted that she found the situation somewhat "scary." The remaining jurors stated that the defendant's condition would not affect their judgment and that they were not concerned for their own health. The record thus discloses no evidence that the jurors who sat on the defendant's case were prejudiced by the knowledge that he supposedly suffered from AIDS. On this basis, we conclude that the defendant has failed to show that actual juror bias deprived him of a fair trial. See *State* v. *Van Straten,* 140 Wis. 2d 306, 409 N.W.2d 448 (Wis. App.) (in the face of unusual and substantial pretrial publicity, trial court did not err in revealing to jurors during voir dire that defendant had AIDS), rev. denied, 139 Wis. 2d 861, 415 N.W.2d 162, cert. denied, 484 U.S. 932, 108 S. Ct. 304, 98 L. Ed. 2d 263 (1987).

The defendant nonetheless argues that we should exercise our supervisory authority over the administration of justice to reverse his conviction. See *State* v. *Cohane,* 193 Conn. 474, 499–500, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); cf. *Marshall* v. *United States,* 360 U.S. 310, 311, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959) (per curiam). He does not, however, advance any reasons other than

those that we have already considered with regard to his constitutional claim. Having concluded that the defendant's right to a fair trial has not been violated, we decline to order a new trial on this basis.

## B

The defendant's ancillary claim is that his right to voir dire under the Connecticut constitution was violated when the trial court dismissed all jurors who, by a show of hands, indicated that they could not be unbiased because of the defendant's medical condition. The defendant argues that, by informing jurors of his medical condition and then dismissing those expressing possible bias in advance of individual questioning, the trial court impermissibly interfered in the voir dire process. Insofar as the defendant recasts in different form the claim he raised with regard to his right to an impartial jury, we have already addressed it fully. To the extent that he raises a distinct claim, however, we consider it briefly.

Under article first, § 19, of the Connecticut constitution, as amended by article IV of the amendments to the Connecticut constitution, "[t]he right to question each juror . . . shall be inviolate." As we noted above, conduct of voir dire is largely within the discretion of the trial court. *State* v. *Fritz,* supra, 161. While we have previously disapproved of undue restrictions on a defendant's examination of individual jurors; see, e.g., id.; *State* v. *Haskins,* 188 Conn. 432, 447, 450 A.2d 828 (1982); we have never held that the right of voir dire encompasses a right to restrict the trial court's discretion to question prospective jurors or its discretion to dismiss any for cause. Moreover, " '[t]he right to challenge is the right to reject, not to select a juror.' " *State* v. *Vitale,* supra, 225, quoting *Hayes* v. *Missouri,* 120 U.S. 68, 71, 7 S. Ct. 350, 30 L. Ed. 578 (1887).

The defendant nonetheless argues that, in dismissing certain venirepersons prior to individual voir dire, the trial court acted outside the bounds of the discretion accorded it by Practice Book § 847. This section provides that after prospective jurors are sworn in, "[t]he judicial authority shall permit counsel to make a preliminary statement as to the names of other counsel with whom he is affiliated, the names of prospective witnesses and other relevant facts. The judicial authority may excuse any prospective juror for cause." Despite his failure to voice any contemporaneous objection, the defendant now urges us to construe this provision to limit the court's discretion to dismiss jurors for cause to situations in which prospective jurors indicate the possibility of bias with regard to affiliated counsel, prospective witnesses, or other relevant information.

We decline, however, to interpret the trial court's authority to dismiss jurors for cause so narrowly. The defendant's construction would impair the ability of the court to exclude from the jury persons about whose impartiality it entertained doubts, regardless of whether the possible bias was related to the grounds enumerated in Practice Book § 847. "The right of the court, in a proper exercise of discretion, to discharge or reject a juror, of its own motion, for good cause, is generally recognized and obviously salutary." *State* v. *Parker,* 112 Conn. 39, 56–57, 151 A. 325 (1930). On the basis of the record before us, we conclude that the court did not abuse its discretion in dismissing for cause, prior to individual voir dire, venirepersons who indicated that they would be affected by the knowledge of the defendant's medical condition or that they were anxious about contagion.

## II

The defendant next claims that the trial court erred in denying his motion to suppress a statement he had

made to the police. To resolve this claim we must review the sequence of events leading up to his confession.

On the night of the crime, December 12, 1984, the Virginia police found the defendant asleep in the victim's car at a rest stop on I-95 in Prince Williams County, Virginia. Upon being arrested, the defendant's only words were "I want a lawyer." The defendant was advised of his *Miranda* rights and taken to jail. After he had been booked, the defendant was again advised of his rights. On both occasions, he declined to sign a notice of rights form or to make a statement. The next day, he was arraigned and the court appointed counsel to represent him. Three days later, he waived his right to an extradition hearing.

On December 17, two Stamford police officers, Sergeant Gerald Oberchowski and Officer Peter DiSpagna, drove to Virginia to pick up the defendant. Prior to taking him into custody the next day, they requested permission from his Virginia attorney to speak to the defendant. Counsel refused the request and thereafter instructed the officers not to question the defendant on the ride back to Connecticut. Counsel also indicated that the defendant, fearing for his life, believed that the officers intended to do him bodily injury on the ride back. When the officers, upon taking custody of the defendant, advised him of his rights, he responded that he had already been informed of them.

On the way back to Connecticut, Oberchowski drove the car while DiSpagna sat in the back seat next to the defendant, who was shackled and handcuffed. They stopped for lunch at a rest area in New Jersey. After DiSpagna returned with lunch for the defendant and himself, Oberchowski went to the restaurant to get his lunch. When DiSpagna handed him his lunch, the defendant asked that his handcuffs be removed so that he could eat. DiSpagna denied his request explaining

that such action would violate police guidelines. According to DiSpagna's testimony, the defendant then replied: "I understand what you have to do. They had to do something like that to me in Manassas [Virginia] because I was under the suicide watch and I understand it." Startled, DiSpagna asked: "Suicide watch?" The defendant explained: "I had a lot of things on my mind and I told them that I was going to commit suicide." When DiSpagna asked why he wanted to commit suicide, the defendant said "Well, there's stuff on my mind and it's still on it." He mentioned that he had spoken to a priest while in Virginia but that he still wanted to talk to someone. He then asked whether he could talk to DiSpagna "off the record" or "as a person." DiSpagna responded that he was a police officer "24 hours a day" and that anything the defendant said he could report. The defendant indicated that he understood but that he still wanted to talk. At this point, Oberchowski returned from the restaurant. Upon being told by DiSpagna of his conversation with the defendant, Oberchowski instructed DiSpagna not to talk to the defendant and to inform him that he could talk when they arrived in Stamford if he so desired. DiSpagna conveyed this information to the defendant. During the remainder of the ride, conversation revolved around neutral subjects such as the weather and the traffic conditions.

The three men arrived in Stamford at approximately 4:30 p.m. Thereafter, when the defendant and DiSpagna were sharing a pizza, the defendant again indicated that he wanted to make a statement. DiSpagna suggested that they finish eating. After dinner, a video camera was set up to tape the interview through a two-way mirror. Oberchowski then returned to the interview room and again advised the defendant of his rights. Because of malfunctioning of the audio equipment, this process of advisement was twice interrupted. During

the second interruption, the defendant requested and was granted permission to call his wife. After his return, Oberchowski handed the defendant a notice of rights form, which he read to himself and then signed. When Oberchowski asked him whether he had any questions, he indicated that he did not. DiSpagna reminded the defendant of their conversation in New Jersey and stated that, if there was anything on his mind, "now is the time to say it." The defendant then confessed to the crime.

On the basis of this evidence, the trial court found that the defendant had invoked his right to counsel upon his arrest in Virginia. It concluded, however, that the defendant, by asking whether he could talk to DiSpagna off the record, had initiated the conversation at the rest stop in New Jersey that resulted in his waiver of that right. It further found that the waiver was knowing and intelligent.

On appeal, the defendant argues that his statement was taken in violation of his right to counsel as guaranteed by the fifth and fourteenth amendments to the United States constitution.[9] Under *Miranda* v. *Arizona,* 384 U.S. 436, 444, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), a suspect in police custody must be informed specifically of his right to remain silent and to have an attorney present during questioning. "An accused in custody, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel." *Smith* v. *Illinois,* 469 U.S. 91, 94–95, 105 S. Ct.

---

[9] Although the defendant invokes article first, § 8, of the Connecticut constitution, he does not advance any arguments for the separate treatment of this issue under the state constitution. Accordingly we need consider only his federal constitutional claim. See *State* v. *Chung,* 202 Conn. 39, 45 n.7, 519 A.2d 1175 (1987).

490, 83 L. Ed. 2d 488 (1984) (per curiam), quoting *Edwards* v. *Arizona,* 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981). The police may not through actions or words engage in conduct "reasonably likely to elicit an incriminating response." *Rhode Island* v. *Innis,* 446 U.S. 291, 302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). After invocation of the right to counsel, a suspect's responses to further interrogation are admissible "only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith* v. *Illinois,* supra, 95.

Invoking this test, the defendant contends that it was DiSpagna who initiated the process resulting in his confession by asking him during the New Jersey lunch break why he wanted to commit suicide. The defendant further argues that even if we were to conclude that he himself initiated the further discussion, the state failed to prove that his waiver of his right to counsel was knowing and intelligent.

The state concedes that the defendant's assertion of his right to counsel upon his arrest in Virginia precluded the Stamford police from interrogating him about the crime. In the state's view, the defendant's confession resulted not from police interrogation but rather from conversations initiated by the defendant himself, at the Stamford police station, that were unconnected with the events that had transpired at the New Jersey rest stop.[10] We agree with the state.

The defendant's claim of interrogation founders on the absence of a direct causal relation between

---

[10] The state also argues, in the alternative, that because the defendant himself opened the discussion of suicide at the New Jersey rest stop, and asked to speak to Officer DiSpagna "off the record," he initiated that conversation also. In view of our disposition of the state's principal argument, we need not consider the merits of this alternative assertion.

DiSpagna's question "why do you want to commit suicide?" and the defendant's confession in Stamford several hours later. Although, in isolation, DiSpagna's question might be construed as "reasonably likely to elicit an incriminating response"; *Rhode Island* v. *Innis,* supra; the fact is that it did not do so. DiSpagna took steps to prevent the defendant from incriminating himself, by reminding the defendant that conversations with a police officer could not take place "off the record." Reenforced by Oberchowski, DiSpagna forbade the defendant from saying anything, informing him that "if he still wanted to talk when they got to Stamford he could do so then." DiSpagna thus left it to the defendant to decide whether to initiate potentially incriminating conversation when they arrived in Stamford. The defendant assented and did not pursue the subject further. In this context, we conclude that no interrogation occurred in New Jersey. See *State* v. *Acquin,* 187 Conn. 647, 668, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983).

Upon their arrival in Stamford several hours later, the defendant again indicated to DiSpagna that he wanted to talk. There is no evidence that this comment was solicited by the police. After dinner, the defendant was administered his *Miranda* rights and then confessed to the crime. This record unequivocally demonstrates that it was the defendant who initiated the discussion that resulted in his confession.

This showing of the defendant's waiver of his right to counsel does not, in itself, validate his confession because, in accordance with the rule of *Edwards* v. *Arizona* and *Smith* v. *Illinois,* the defendant's waiver must also have been knowing and intelligent. It is well established that the state has the burden of proving by a preponderance of the evidence that the defendant waived his *Miranda* rights. *State* v. *Barrett,* 205 Conn.

437, 449, 534 A.2d 219 (1987); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987). For a waiver to be valid, it must not only be voluntary but must also constitute "a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards* v. *Arizona,* supra, 482; *State* v. *Barrett,* supra, 450. This inquiry requires consideration of "the particular facts or circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).

The defendant argues at the outset that the statements indicating his intent to waive his right to counsel were at best ambiguous. In support, he relies on evidence that Oberchowski consulted with his superiors prior to taking the defendant's statement, and that the officer was instructed to make sure that the defendant understood his rights and that he knew of his Virginia counsel's advice against talking with the police. We do not, however, construe this evidence to suggest that the police were uncertain about the defendant's intent; it demonstrates rather their appropriate concern that the defendant's statement be taken with due respect for his constitutional rights.

The defendant next suggests that there was insufficient evidence that he acted voluntarily in making a statement. In support, he points to evidence that he was afraid of Oberchowski and DiSpagna. We are not persuaded. The police testified that the defendant, although initially fearful, became increasingly relaxed and talkative during the ride to Connecticut. At the time of his confession, he had just finished eating and had spoken with his wife. The defendant does not allege, nor is there evidence, that the police resorted to improper inducements to obtain the confession. We therefore agree with the trial court's conclusion that the defendant was not coerced into making a statement.

The record also supports the trial court's conclusion that the defendant understood his rights. The defendant has never claimed that he did not understand the warnings that were repeatedly given to him. When the Stamford police first administered *Miranda* warnings to the defendant in Virginia, he indicated that he understood them and that he had already heard them. In Stamford, the defendant read the "Notice of Rights" form and signed it. When asked whether he had any questions, he indicated that he did not. The defendant's initial invocation of his right to counsel further suggests that he understood his rights. "[W]e have held that the assertion of the right to remain silent after an initial willingness to speak with police is a strong indication that the defendant understood his rights." *State* v. *Barrett,* supra, 451. The initial invocation of the right to counsel similarly serves to demonstrate that a defendant acted knowingly and intelligently in subsequently deciding to waive that right.

In addition, we view the dialogue between the defendant and DiSpagna during the New Jersey lunch break as particularly probative. When DiSpagna explained to the defendant why a police officer could not engage in a conversation "off the record" or "as a person," the defendant responded that he understood but that he wanted to make a statement anyway. Thus the defendant, having been fully informed of the implications of making a statement, nevertheless persisted in his desire to do so. In the light of this record, the knowing and intelligent nature of the defendant's waiver was not vitiated by the failure of the police specifically to remind him of the advice of his Virginia counsel.

The defendant nonetheless maintains that the evidence of a knowing and voluntary waiver was insufficient because he signed a "Notice of Rights" form rather than a "Waiver of Rights" form. We have previously rejected the identical claim "as one that elevates

form over substance." *State* v. *Gonzalez,* 206 Conn. 213, 219, 537 A.2d 460 (1988); *State* v. *Weidenhof,* 205 Conn. 262, 269, 533 A.2d 545 (1987). Under the totality of the circumstances, " 'the defendant's expressed willingness to speak constituted an explicit affirmative act evidencing waiver, which the court could reasonably find persuasive despite the defendant's [failure] to sign [a] waiver form.' *State* v . *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983)." *State* v. *Gonzalez,* supra.

III

In his final claim of error the defendant challenges the trial court's jury instructions on circumstantial evidence. Although the defendant failed to request a charge on this issue or to object to the charge as given, we have previously held that such a claim is reviewable under *State* v. *Evans,* supra; *State* v. *Gonzalez,* 205 Conn. 673, 685–86, 535 A.2d 345 (1987).

The trial court gave the following instructions on circumstantial evidence: "Proof beyond a reasonable doubt does not mean that you have to have direct evidence supporting a fact. You may apply the rule of circumstantial evidence. This rule involves the offering of evidence of facts from which you are asked to infer the existence of another fact or set of facts. Such an inference may be made provided two elements in the application of this rule are satisfied. One, that the fact from which you are asked to draw the inference has itself been proved beyond a reasonable doubt and two, that *the inference asked to be drawn is not only logical and reasonable, but is strong enough so that you can find that it is more probable than not that the fact to be inferred is true.* " (Emphasis added.) The defendant claims that the use of the more probable than not standard unconstitutionally diluted the state's burden of proof.

We have repeatedly disapproved of the use of the more probable than not standard in instructions on circumstantial evidence. Id., 692; *State* v. *Robinson,* 204 Conn 207, 211, 527 A.2d 694 (1987). In resolving the further question of whether such instructions were harmful beyond a reasonable doubt, we have applied a bifurcated standard of review. " ' "Where the principal factual issue at trial is intent, which is typically proven by circumstantial evidence, 'we will closely scrutinize the court's instructions' on circumstantial evidence, in isolation from the remainder of the charge, to determine whether the court misled the jury as to the state's burden of proof." *State* v. *Robinson,* [supra, 210]. . . .' " *State* v. *Gonzalez,* 205 Conn. 673, 690–91, 535 A.2d 345 (1987); *State* v. *McDonough,* 205 Conn. 352, 358, 533 A.2d 857 (1987), cert. denied,     U.S.     , 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988). Otherwise, we consider the erroneous instruction in the context of the charge as a whole to determine whether it is "reasonably possible that the jury was misled." *State* v. *Gonzalez,* 205 Conn. 673, 690–91, 535 A.2d 345 (1987); *State* v. *McDonough,* supra.

The defendant urges us to apply the former standard of review, claiming that intent was a principal issue at trial. In support, he points to the trial court's extensive instructions on the specific intent required to find the defendant guilty of larceny, a necessary predicate of his felony murder conviction. From our review of the record, however, we conclude that the principal factual issue at trial was not intent but identity. In addition, there was ample direct evidence of identity, including testimony from the defendant's sister, who had witnessed the crime, and the defendant's statement to the police. See *State* v. *Gonzalez,* 205 Conn. 673, 693, 535 A.2d 345 (1987). Accordingly, we consider the instructions in the context of the charge as a whole to determine "whether it was reasonably possible that the jury was misled."

We conclude that the erroneous instruction was harmless beyond a reasonable doubt. Prior to giving the erroneous instruction, the court stressed several times that the state had the burden of proving the defendant's guilt beyond a reasonable doubt. The court reiterated the beyond the reasonable doubt standard with regard to the elements of the offense to which that standard applied. In particular, the court stated that the jury had to find that the defendant had the requisite intent to commit robbery beyond a reasonable doubt. In this context, we conclude that it is not reasonably possible that the jury was misled as to the state's burden of proof.

There is no error.

In this opinion the other justices concurred.