[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this habeas action, the petitioner has filed a four-count amended petition dated March 3, 1997. The petitioner claims that his confinement in the custody of the Commissioner of Corrections is unlawful on the following bases: (1) that he was denied Due Process in the underlying criminal proceedings due to the inherently prejudicial trial atmosphere; (2) that he was denied Due Process due to the actual prejudice of the trial jury; (3) that he was denied the effective assistance of trial counsel; and, (4) that he was denied the effective assistance of appellate counsel.
At the habeas hearing, the court heard testimony from the petitioner, two of the criminal trial jurors, two court reporters, trial and appellate counsel, and from individuals with expertise relevant to issues presented by the petitioner. Additionally, the court received documentary evidence, including the transcript of court received documentary evidence, including the transcript of the underlying criminal proceedings. Based on CT Page 7922 the evidence adduced at the habeas hearing, the court makes the following findings and order.
On September 28, 1985, following a jury trial in the Judicial District of Fairfield at Stamford, the petitioner was found guilty of the offense of Felony Murder in violation of Connecticut General Statutes § 53a-54c. Thereafter, on November 7, 1985, he was sentenced to a period of forty-five years confinement.
The petitioner's conviction was affirmed on direct appeal.State v. Mercer, 208 Conn. 52 (1988)
The petitioner is currently an inmate in the custody of the Commissioner of Corrections serving the imposed sentence.
In the underlying criminal trial, the petitioner was represented by Assistant Public Defender Jerome Rosenblum. The State was represented by Assistant State's Attorney Bruce Hudock. Judge Harold H. Dean presided. On appeal, the petitioner was represented by Special Public Defender Paul F. Thomas.
For reasons that are relevant to some of the petitioner's claims, the court notes that the petitioner is an African-American male, and that the victim was a Caucasian female.
At the criminal trial, the State introduced evidence that on December 12, 1984, at approximately 9:00 a.m., the victim Susan Larson parked her Lincoln automobile in a parking lot adjacent to the offices of her employer, Transcience Co., in Stamford. As the victim stepped from her car, the petitioner, who had been standing nearby, pulled out a gun and told her that he wanted her car keys. When Ms. Larson smiled at him and started to walk away, the petitioner shot her in the head, took her keys, and drove off in her car. The victim died shortly thereafter from the gunshot wound.
The State's first trial witness was Danine Mercer, the petitioner's sister. Ms. Mercer testified that she lived in a building adjacent to the Transcience parking lot, and that the petitioner had spent the night of December 11, 1984 with her. She stated that the petitioner left her apartment on December 12, 1984 at 7:30 a.m., returned between 8:30 and 9:00 a.m., and left again around 9:00 a.m. She noted that the petitioner had a gun CT Page 7923 tucked into his waistband. Shortly after the petitioner left, Ms. Mercer heard a noise from the direction of the parking lot, a popping sound, and when she looked out the window, she saw a woman falling to the ground. She also saw an African-American male jump over a fence bordering the lot, approach the prone woman, and take keys from her purse. She saw the man go to a nearby car, get in the car, and drive off.
Ms. Mercer observed this scene from a second floor window close to and facing the parking lot. During her trial testimony, Ms. Mercer initially said that the person she saw was the petitioner. She then stated that the person looked like her brother. She said his clothes, size, and body characteristics were the same as her brother's. She did not see the person's face.
Transcience employee Jacqueline McCree testified that she was in the victim's office at 9:00 a.m. when she saw a man with a gun take keys from the victim's purse, and drive off in her Lincoln automobile. While she did not see the perpetrator's face because he was looking away from her, she was able to identify his clothes. She described the perpetrator as a black male in his thirties. She was unable to select the petitioner from a subsequent photographic array at the Stamford police station.
Stamford Police Officer Robert Braccia testified that it was his opinion, from bullet fragments retrieved from the victim, that she had been shot with a .38 caliber weapon.
Virginia State Police Trooper W.C. Blydenberg testified that in the afternoon of December 12, 1984, while he was on duty on I-95 in Prince William County, Virginia, he noticed a Lincoln Town car parked at a highway rest stop in an out-of-the way location. Suspicious, he approached the car and found the petitioner asleep in the back seat. When the petitioner was taken into custody, a .32 caliber pistol was retrieved from the automobile.
Virginia State Trooper M.J. Ritchie testified that an inspection of this weapon revealed that it contained five unfired bullets, and one spent bullet jacket. Also in the car was documentary evidence that the pistol had been purchased by the petitioner from a South Carolina arms merchant. Trooper Ritchie stated that a .38 caliber weapon is slightly larger than a .32 caliber. Subsequent evidence adduced by the State indicated that CT Page 7924 a .38 bullet is thirty-one thousands of an inch (30/1000") larger than a .32 caliber.
Trooper Blydenberg testified that the petitioner was advised of his Miranda rights at the scene and again at the Virginia State Police barracks. cf. Miranda v. Arizona, 384 U.S. 436
(1966).
Stamford Police Officer Gerald Oberchowski testified that he and another officer drove to Virginia to bring the petitioner back to Connecticut. He stated that at the beginning of the trip the petitioner was advised of his Miranda rights, and he was again advised of his Miranda rights at the Stamford Police Station at the completion of their trip. Officer Oberchowski testified that the petitioner gave a statement once in custody at the Stamford Police Station. In his confession, the petitioner stated that on the morning of December 12, 1984, he had wanted to get to South Carolina, and was standing on the outside of a fence near the Transcience parking lot when he saw a car drive in. He told the driver, "Lady, I want the keys." When the woman turned, laughed at him, and started to walk toward the building, he pulled the trigger on his weapon, and she fell. The petitioner stated to Officer Oberchowski that he then climbed over the fence, ran forward to her, grabbed the car keys that fell from her pocket book, got into her car, and left. He stated that he picked up some clothes at a family residence in Manhattan, traveled south on the New Jersey Turnpike, and then went to sleep in the car in Manassas, Virginia.
Stamford Police Officer Peter Di Spagna, who was also present for the petitioner's interview, separately testified to the contents of the confession.[1]
Trooper Edward McPhillips, of the Connecticut State Police Forensic Laboratory, testified that the bullet fragments found in the victim's body were fired from the .32 caliber weapon removed from the Lincoln automobile when the petitioner was apprehended.
While the defense educed no oral testimony, Attorney Rosenblum introduced a police report to show that no fingerprints of the petitioner were found on the Lincoln Town car, and that two individuals who were in the vicinity of the occurrence in the Transcience lot were unable to identify the petitioner from a photo array. One of these individuals was Ms. McCree who testified as a State's witness that she did not see the CT Page 7925 perpetrator's face. The other individual was not called by either party to testify.
Count One of the Third Amended Petition consists of thirty-eight separately numbered paragraphs. In his trial brief, the petitioner characterizes Count One as setting forth claims that the petitioner was denied Due Process due to an inherently prejudicial trial atmosphere, that his trial was infected by inherently prejudicial extrinsic communications to jurors, as well as an inherently prejudicial atmosphere which permeated the courthouse, and that his conviction was obtained in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 8 of the Connecticut Constitution. In his brief, the petitioner states that this count sets forth factual claims to support the legal conclusion that he was denied his right to a fair trial, his right to be presumed innocent, and his right to a verdict rendered solely on the basis of evidence presented in open court, rather than on impermissible extrinsic factors.
Count Two of the Amended Petition incorporates the first thirty-four paragraphs of Count One, and adds the claim that the injection of AIDS into the courtroom, through communications to jurors and the courthouse atmosphere, actually prejudiced the trial jury and violated the petitioner's constitutional rights to due process and to a fair trial.
The petitioner testified at the habeas hearing. Following his arrest on December 12, 1984 in Virginia, and subsequent return to Connecticut, the petitioner was remanded to the Bridgeport Correctional Facility where he remained until conviction and sentencing. During April, 1985, feeling sick, and noting that his lymph glands were swollen, the petitioner met with a corrections physician who arranged for medical tests to be conducted at Yale-New Haven hospital. Shortly after having blood tests, the petitioner was removed from the general inmate population and placed in an isolation cell at the Bridgeport facility where he was fed on paper plates, prohibited from using the phone, not allowed visitors, and required to take recreation alone. In mid July, 1985, he met with Corrections physician Edward Blanchette, M.D., who informed him that he had tested positive for the presence of antibodies for Human Immunodeficiency Virus (HIV). He understood from his conversation with Dr. Blanchette that he was a carrier of the virus, that he did not, in fact, have Acquired Immune Deficiency Syndrome (AIDS), but that he had the potential CT Page 7926 of infecting other people with the virus.
On July 31, 1985, the petitioner received a pass to go to a holding area in preparation for being transported to a scheduled court appearance when he was greeted by a sheriff who informed him that because he had tested positive for the "AIDS complex", he would not be transported to court. He was returned to the hospital unit. Later that day, the sheriff returned, now wearing a medical gown, mask, and rubber gloves. In this outfit, the sheriff transported the petitioner to the Stamford Police Station, adjacent to the court house. He was later taken to the court house in the company of numerous sheriffs wearing rubber gloves, but then returned to the correctional facility with no court action on that day.
Attorney Hudock testified at the habeas hearing that on either July 30th or July 31st, he received information that the petitioner had AIDS, and that he was being confined in isolation at the Bridgeport correctional facility. While not certain of the origin of this information, it was his best recollection that he had received this report from the Sheriff's department. He stated that he contacted Attorney Rosenblum, and both counsel then met with Judge Dean in chambers. Attorney Hudock testified that the principal issue discussed at this meeting was how to provide the petitioner with a fair trial in light of the information that he was then being held in isolation. Attorney Hudock testified that over the next twenty-four hours he was involved in a series of conversations concerning this issue, and that these discussions included consideration of the manner in which sheriffs would handle the petitioner while protecting themselves. Attorney Hudock further stated that during this twenty-four hour period he learned that the press had become aware of the petitioner's condition, and he recalled thinking that if this issue had already been disseminated to the press, it was likely to be known by the jury. For Attorney Hudock, the question of how to deal with the jury became another issue for consideration. He recalled pondering the question whether the jury panel should be informed, in advance, of the petitioner's condition lest the actual jury members learn it from extrinsic sources once the trial had started.
Attorney Hudock testified that he recalled that an article about AIDS had recently been published in TIME magazine, and that there were public perceptions and fears about AIDS.[2]
CT Page 7927
Attorney Hudock further testified that once he got a telephone call from a reporter indicating awareness that the petitioner had AIDS, he formed the belief that the petitioner's condition was going to be a public issue that he, Attorney Rosenblum, and Judge Dean were going to have to deal with in a number of ways. He stated that conversations among himself, defense counsel, and the court centered around these concerns.
Attorney Rosenblum testified that he first learned of the petitioner's condition on July 31, 1985. He indicated that he had been ordered to court for a status conference, and that while he was in chambers with Judge Dean and Attorney Hudock, they were informed, either by a clerk or a representative of the Sheriff's Department, that the sheriffs did not want to transport the petitioner to court because he had AIDS. While, from Attorney Hudock's testimony, it may be possible to conclude that he was first alerted to the petitioner's condition on July 30th, it is clear to the court that Attorney Rosenblum first acquired this information on July 31st while in chambers with Judge Dean and Attorney Hudock, and that the source of the information was the Sheriff's Department.
Attorney Rosenblum recalled that once this information was transmitted, Judge Dean ordered the sheriffs to bring the petitioner to court. Additionally, Attorney Rosenblum testified that he, Attorney Hudock, and Judge Dean proceeded to a conversation concerning courtroom safety issues related to the petitioner's condition. He recalled that Judge Dean expressed concerns about how the disease might be transmitted, and whether people could safely be in the petitioner's presence without risk of infection. During this conversation, they discussed the possibility of using an isolation booth in the courtroom, or placing the petitioner in a different room during the trial.
Attorney Rosenblum testified at the habeas hearing that he was aware of the existence of AIDS in 1985, and that his knowledge of the subject was based on magazine articles and television. He was aware of the term, AIDS-Related Complex (ARC), which he believed was a first step toward the eventual development of AIDS. When he was first told of the petitioner's condition, he was simply informed that the petitioner had AIDS.
Following the events of July 31, 1985, Judge Dean decided,sua sponte, to conduct a hearing on whether the petitioner's presence in the courtroom during the trial would pose any risk of CT Page 7928 infection to others. He also instructed Attorney Hudock to explore other alternatives, including the use of video equipment, to enable the petitioner to observe the trial from another room.
On August 2, 1985, both the Stamford Advocate and the Bridgeport Post published articles concerning the petitioner's condition and his upcoming trial. The Stamford Advocate, a newspaper of general circulation in lower Fairfield County, published an article with the headline, "Murder suspect with AIDS may see his trial on TV". In this article, Attorney Hudock was quoted as saying, "I'd say there is a general atmosphere of concern." Petitioner's Exhibit 6. The article further stated,
"AIDS, which is uniformly fatal, breaks down the body's immune system and allows infections to develop. It is usually transmitted sexually, but the uncertainties surrounding it have those responsible for Mercer's trial worried." Id.
Attorney Rosenblum was also noted in this article. The article reported,
"Mercer's attorney, Jerome Rosenblum, said he thinks the judge is concerned about potential jurors becoming scared . . . asked if his client can get a fair trial if he's not in the court room, Rosenblum said, `That's a good question. I don't know the answer to that.'" Id.
Additionally, this article quoted Attorney Rosenblum as stating that the petitioner was bisexual. Id.
The article further stated,
"Mercer is being held in medical isolation at the Bridgeport Correctional Center. His previous court appearances have been marked by high security after officials said threats were made against him. Mercer has been under heavy guard while in court and the first rows of spectator seats have been roped off. Authorities confirmed yesterday that Mercer had AIDS after a rumor-filled day in Superior Court in Stamford Wednesday, when motions on Mercer's case were scheduled to be heard. On the list of prisoners names given to transport sheriffs, the words "medical warning" appeared next to Mercer.
Sheriff Tony Verrico said, `I was given a warning to avoid blood contact, body contact or contact with bodily fluids.' He CT Page 7929 said he then notified the state's attorney's office of Mercer's condition.
Verrico said he has talked to other transport sheriffs in the state and he knows of no other prisoners with AIDS having to be transported for trial. He also said he is worried about contact with Mercer.
`All I know is what I hear on television' Verrico said, `You can't get doctors to agree to the same cause. Me and my partners are concerned. What are the chances for contamination being as they're keeping him out of the population of the jail?"' Id.
While the Bridgeport Post article was shorter, it followed the same path.
Subsequently, on August 6, 1985, the Stamford Advocate contained an article under the headline, "Judge to consider room for AIDS victim." Id.
In this article, the newspaper reported that the court would conduct a hearing consisting of medical evidence to determine whether Mercer would have to watch his trial in a separate room via television. The article reported that contingency plans were already in place for Mercer to observe his trial on television from another room, with a microphone available to him to speak with Attorney Rosenblum. On the same day, the Bridgeport Post ran a similar story. In the Post article, Attorney Hudock was quoted extensively, including the following:
"Hudock said expert testimony will be sought on how much risk this would be to others around Mercer, and whether the malady could be transmitted within the courtroom atmosphere.
Hudock said his own understanding, although not based on professional medical knowledge of his own, is that AIDS is normally transmitted via bodily fluids. Therefore, the disease might not be transmittable in the absence of direct physical contact.
`If it can only be transmitted through intimate contact, it is unlikely that any of the court staff or sheriffs have contracted it unknowingly up to this point', he said.
The court was ready to start picking a jury for the trial CT Page 7930 late last week when the AIDS report was received, said Hudock. Legal proceedings were brought to a halt until the health item could be disposed of.
Mercer was present in court last week for what was supposed to be the start of his case with selection of a jury, although the AIDS report apparently was not of general knowledge then.
Hudock said it's uncertain where or when Mercer might have picked up AIDS. He said he understands that the disease has a two to five year incubation period.
However, Hudock admitted uncertainty whether it now would even be possible to pick a jury to sit in the same courtroom with Mercer to try his case. `In any case, we need to figure out how to give him a fair trial.'" Id.
On August 6, 1985, the court conducted a hearing at which Edward Blanchette, M.D., then the Medical Director of the Somers Correctional Institution, was the sole witness. The petitioner was neither in attendance at this proceeding nor notified in advance that it was going to occur. While defense counsel noted the absence of the petitioner from the hearing, and took exception to proceeding in his absence, counsel did not specifically object to the hearing itself. At the hearing, Dr. Blanchette testified that the petitioner was infected with the HTLV-3 Virus-ARC. He stated that Mercer, as a carrier of the virus, had the potential for transmitting AIDS. Under questioning from the court, Dr. Blanchette testified that the petitioner could participate in his trial. With respect to the manner in which the virus could be transmitted, Dr. Blanchette testified that the disease could be transmitted by intimate contact, through blood products, and that while saliva was a gray area, it would take very intimate contact with saliva to transmit the virus. He stated that there was no medical evidence that spitting, coughing, or sneezing promoted the spread of the virus. Under questioning from the court, Dr. Blanchette asserted that he could guarantee jurors 100% that they could not get AIDS from the petitioner's sneezing. As to precautions for those responsible for the petitioner's in-court custody, Dr. Blanchette gave his opinion that no precautions would be necessary. The hearing was conducted in open court with no requests from either counsel that it be closed.
Dr. Blanchette's testimony was reported on the first page of CT Page 7931 the Advocate on August 7, 1985. In the article, headlined, "Doctor: No threat to jurors in trial of suspect with AIDS", the Advocate reported,
"A Stamford murder suspect diagnosed as a carrier of AIDS would pose no health threat to a jury or his attorney during a long trial, the medical director of Somers state prison said yesterday.
Dr. Edward A. Blanchette added, however, that although AIDS is usually transmitted sexually or through blood, there is a `gray area' in medicine concerning transmission of the disease through saliva, such as through a cough or a sneeze." Id. The article further stated,
"In an interview after the hearing, Blanchette said that isolating Mercer from the jury, `would really be going very much beyond' what is needed.
`We're also dealing with a political and social problem rather than a medical one.' said Blanchette, an infectious disease specialist who also works at St. Francis Hospital in Hartford. `There's so much paranoia with regard to this particular disease.' Id.
With respect to the issue of saliva, the article reported that,
"Blanchette, under questioning from Dean, Hudock and Public Defender Jerome Rosenblum, said repeatedly that acquired immune deficiency syndrome cannot be contracted through normal social contact.
`There is unanimity about routine social contact. It is not a danger.' he said.
AIDS attacks the body's immune system and allows infections to develop that are almost always fatal. Those must susceptible are homosexuals, Haitians, intravenous drug users and hemophiliacs who need blood transfusions.
In his testimony, Blanchette said among the many unanswered questions about AIDS is whether it's transmitted through saliva. Court officials first learned of Mercer's condition last week when sheriffs bringing him to court were given a medical alert. CT Page 7932
Blanchette said most medical authorities say it would take prolonged contact with saliva — `for instance, French kissing' — for the disease to be transmitted. But Dean asked, `What's the difference between lots of saliva and a little saliva?'
Blanchette said, `That's a question we just haven't answered', but said later there is no evidence to show that sneezing poses a risk.
`Can I say to the jurors that I guarantee 100% that there is no way they will contract AIDS out of the defendant sneezing?' Dean asked.
`I could say that. Sure.' Blanchette responded.
`Is there any medical authority to the contrary?'
`I know of none.'
Blanchette, who has examined Mercer, also testified that there is no cause for concern for Rosenblum, who would be sitting beside Mercer, and conferring with him each day of the trial."Id.
Judge Dean subsequently decided that the petitioner could be present during his trial. This ruling was reported on August 10, 1985 in both the Advocate and the Post. The Advocate's article, carried with the headline, "No isolation for suspect with AIDS. Judge: Trial should proceed normally", indicated that both counsel were satisfied with the outcome of the hearing. The Post article, headlined, "Man with AIDS to be at his slaying trial", stated, in reference to the court's decision,
"He apparently accepted the statements of Dr. Edward Blanchette, who said Mercer is not likely to transmit the disease as long as direct physical contact is averted." Id. The article further stated,
"Deans ruling means court (sic) that officials will need to contend with the question of whether awareness of Mercer's disease will make it difficult to pick a jury." Id.
It is clear from a reading of these, and other, newspaper CT Page 7933 articles presented as evidence during the habeas hearing, that the newspapers had access to both the State's Attorney's office as well as Attorney Rosenblum. Indeed, even the petitioner participated in the news-making process. In the August 29, 1985 issue of the Bridgeport Post, the petitioner was quoted as complaining about his conditions of confinement, and of stating that he had shunned his homosexual relationships three years ago and soon after was married. Id.
Newspaper accounts continued up to and throughout the trial.
Jury selection in the petitioner's case started on September 4, 1985. Prior to the commencement of individual voir dire, Judge Dean addressed the venire. He indicated that one of the trials for which the venire had been summoned was a murder trial involving a defendant with AIDS. Judge Dean informed the group about the hearing with Dr. Blanchette, and that Dr. Blanchette had given 100% assurances that jurors for the case would be in no danger of contracting AIDS merely by sitting as jurors in the same room as the defendant. Following this report, when Judge Dean asked if any of the panel wished to be excused in relation to the petitioner's condition, fourteen individuals raised their hands. They were promptly excused and left en masse. Neither counsel objected to the fact that the Court, sua sponte, brought up the issue of AIDS, or that the court unilaterally excused prospective jurors who indicated a preference not to sit based on the petitioner's medical condition. On September 12, 1985, having exhausted the list of prospective jurors from the first panel, the court swore in a second venire panel. At this time, upon prompting by both counsel to raise the issue of the petitioner's medical condition, the court informed the group that the petitioner had AIDS. The court made a similar statement to a third group sworn on September 13, 1985.
Individual voir dire examination began on September 4, 1985. A review of the transcript reveals that potential jurors were asked whether they had any prior awareness of the case from media reports. Counsel also informed each prospective juror of the petitioner's medical condition, though their descriptions and terminologies were imprecise and, at times, incorrect. In some instances, the petitioner was described as having AIDS, while in others, Frank AIDS, and in others, ARC. With respect to the petitioner's condition, counsel generally asked prospective jurors whether it would predispose them toward or against him, whether knowledge of the petitioner's condition gave them a CT Page 7934 preconceived notion of the petitioner, and whether the juror would feel any discomfort hearing the case as a result of information about the petitioner's medical condition.
During the habeas hearing, the petitioner introduced evidence from Alvin Novick, M.D., a professor of Ecology and Evolutionary Biology at Yale University, and from Gerald Friedland, M.D., the Director of the AIDS program at Yale. Dr. Friedland's areas of specialty include infectious diseases and AIDS. He is Board-certified in infectious diseases. His scholarship in the AIDS field includes the publication of approximately one hundred articles and numerous books. Additionally, he is a reviewer for several scholarly journals. Of particular interest to Dr. Friedland have been studies on the mechanism of transmission of AIDS, involving the question of whether AIDS can be transmitted by casual social contact.
Dr. Friedland reviewed Dr. Blanchette's pretrial testimony, and stated that he concurred with the opinions expressed by Dr. Blanchette. He further stated that, based on information which had been published by 1984 relating to the transmission of AIDS by casual contact, there was no reason for the court to have advised prospective jurors of the petitioner's condition, and there was no reason to excuse jurors solely on their fears related to AIDS. He also testified that there was no valid medical reason for the sheriffs to be wearing latex gloves in the presence of the petitioner, or for the Department of Corrections to have held him in isolation while in confinement. With respect to the mainstream media, Dr. Friedland commented that reporting by the popular media about AIDS in 1984 and 1985 was mixed, with some responsible reporting as well as much that was inaccurate, inflammatory, and hysterical. He also noted, based on his studies and review of the literature, that at the time of the petitioner's trial there was considerable unwarranted fear of AIDS in the public based, in part, on the unwillingness of many to separate the available facts about AIDS from their perceptions and biases about the disease, particularly with regard to public judgments concerning the perceived at-risk population.
Since the early 1980's, Doctor Novick has contributed substantial scholarship in the field of AIDS. He has been the editor of the scholarly Journal of AIDS and Public Policy, and he has served on numerous boards related to the topic of Ethics and AIDS, and the community response to AIDS. He teaches courses on AIDS and Society, Public Policy and AIDS, and the Biology of CT Page 7935 AIDS. He has focused, as well, on the epidemiology of AIDS. Dr. Novick has provided direct care to members of the gay community, and has worked with injection drug users, and with members of the minority community on AIDS-related issues. He has written in excess of fifty articles on AIDS, or AIDS related topics, most prominently on the subject of public policy toward AIDS and AIDS victims. Dr. Novick testified that in 1985, although there was ample evidence in the literature that AIDS could not be contracted by casual contact, there was substantial public fear of AIDS and stigmatization of AIDS victims. Dr. Novick stated that in 1985 there was widespread anxiety concerning the spread of AIDS, even though the extent of the fear was not warranted given the status of available scientific knowledge at the time. He also stated that the general public perception of individuals with AIDS was that they had somehow misbehaved, had fallen from grace, and that people such as gay men and drug users were to be feared. Dr. Novick testified that, as a general proposition, members of the uninfected public were judgmental and uncharitable about those with AIDS.
The court accepts, as proven, that in 1985, at the time of the petitioner's trial, there was public fear about AIDS in the general community, and widespread ignorance concerning the particular mechanisms for the spread of this disease. The court also accepts, as proven, that many members of the general population perceived gay men and drug users as particularly susceptible to AIDS, and that both of these groups were stigmatized by large portions of the general population. Indeed, the court credits the testimony of Dr. Novick that, notwithstanding the availability of counter-indicative data in the literature, many medical professionals, hospitals, and other service providers were resentful of the AIDS-afflicted population, and disinclined to provide services to them.
Also testifying at the habeas hearing was Professor Neil Vidmar who has a dual assignment as a professor at the Duke Law School and as a professor in the Department of Psychology at Duke. Professor Vidmar, who has a Doctorate in Social Psychology, has contributed scholarship in the interface between social science in law. In particular, he has studied, taught, and published on the topics of jury behavior, jury decision making, and the effect of pretrial publicity and prejudice on jury decision making. In preparation for his habeas testimony, Professor Vidmar read the transcript of voir dire examination in the petitioner's trial, the newspaper articles published around CT Page 7936 the time of the trial, the habeas testimony of two physicians concerning AIDS, and the habeas testimony of two court monitors, two jurors, and Attorney Hudock. Additionally, he read the appellate brief filed on behalf of the petitioner. Dr. Vidmar reported his research findings, and publication of research of reputable colleague that jurors' prior biases and prejudices may influence how they perceive trial evidence, and that pretrial influences on jurors color how they receive and integrate trial evidence.
In this case, Dr. Vidmar identified numerous facets of pretrial publicity that could have influenced juror perception of the evidence, including the fact that the petitioner is an African-American, that the victim was a white female, that the petitioner was reported in the newspaper to be bi-sexual, that he was reported to have AIDS, that many in the community associate AIDS with drug use, and bi-sexuality with sexual promiscuity. Dr. Vidmar testified that these prejudices, prevalent in the community and resulting in stereotyping, can subconsciously influence a juror's perception of the evidence, and consequently, the jury's decision making process.
Having testified to the these general propositions, Dr. Vidmar was then asked his opinion as to whether these factors likely influenced the trial juror's decision making process in the petitioner's underlying criminal trial. To this, and succeeding similar questions, the court sustained the respondent's objections.
The court has carefully reviewed the transcript of the individual voir dire and concludes that while the examinations may; not have been consistently performed at the peak of artistry, there is an inadequate factual basis for the conclusion, suggested by Professor Vidmar, that general relevant community biases, or prejudices, which may have been formulated by pretrial publicity, seeped either consciously or subconsciously into the minds or dispositions of the jurors who were ultimately selected to serve in the Mercer trial. Also, while the understanding of this credible research into the influence that bias and prejudice may have on juror behavior is a helpful illumination, the court does not believe it a reasonable scientific construct to infer from this general research, specific, bias or prejudiced-driven conduct on the part of particular jurors in their deliberative process. CT Page 7937
At the habeas hearing, two court monitors testified. Karen Pacchiana testified that she has been a monitor in Stamford since March, 1984, and that she was present in the courthouse during the Mercer trial.[3] Ms. Pacchiana stated that there was much discussion; in the courthouse among court staff about the petitioner's medical condition. She commented that treatment of the petitioner by the sheriffs was different, that they wore latex gloves in the courtroom, that she had never seen that before. She testified that she was personally fearful of being in the same courtroom as the petitioner. She characterized the courthouse atmosphere as one of concern, anxiety, and fear about the possibility of contracting AIDS just by being in the courtroom.
Sharon Haas testified that she served as a court monitor from July, 1985 to September, 1985 at the Stamford J.D. courthouse, and that she was nervous and apprehensive at the time about being in the same room as the petitioner. She asked to be excused from participating in the trial. She also recalled that the sheriffs assigned to the Mercer trial wore latex gloves while in the courtroom.
The court concludes from the testimony of the court monitors that at the time of the petitioner's trial, they were apprehensive about being in the same room as him, and that the petitioner's medical condition was the frequent topic of discussion among courthouse staff while the trial was under way.
During the course of the trial, numerous events external to the trial itself took place which the petitioner now claims denied him a fair trial.
The trial commenced on September 17, 1985, and concluded on September 28, 1985. On September 23, 1985, Attorney Rosenblum, in the absence of the jury, brought to the court's attention his concerns that an incident had occurred between a member of the Sheriff's Department and the victim's sister in the presence of one of the jury alternates. Attorney Rosenblum posed the question for the court whether the alternate should be questioned about the incident and instructed neither to draw any inferences from it nor to discuss it with other jury members. In response, Judge Dean indicated a belief that the incident could be magnified in the mind of the alternate by bringing the person into the courtroom for questioning. The court also indicated its belief that the alternate had received repeated instructions not to CT Page 7938 discuss extrinsic matters with other jurors. There is no further mention of this incident in the trial proceedings. There is no evidence that any member of the jury learned of this incident.
On September 24, 1985, in the absence of the jury, Attorney Rosenblum reported to the court, based primarily on information supplied to him by the State, that starting in January there had been various incidents involving the petitioner, his wife and members of the victim's family. Attorney Rosenblum indicated that there was a death threat made against Ms. Mercer in January, that in January the victim's brother punched the petitioner while in the courthouse. Attorney Rosenblum also expressed his understanding that there had been recent death threats against the petitioner and against the court. Finally, Attorney Rosenblum reported that on the evening of September 23, 1985, while the petitioner was in the sheriff's van, one of the victim's brothers followed the van, pulled his car along side, and pointed his finger at the petitioner as if it were a gun. Counsel stated, "My concern your Honor, is that Mr. Mercer get a fair trial and that these incidents do not poison the atmosphere here to the point where a jury cannot fairly decide this case." Petitioner's Exhibit 1, Trial Transcript, 480-481 (September 24, 1985) Counsel stated that his purpose in, informing the court of these incidents was to alert the court to his intention to seek a mistrial should any such incidents occur in the courtroom. Nothing further was mentioned of these alleged incidents. No motions were made in regard to them.
During the habeas hearing, two of the Mercer trial jurors testified. Ina Cameron, now Winn, stated that though she had not been aware of any publicity about the petitioner prior to the trial, she became aware of the petitioner's medical condition from statements made by the court, at the start of jury selection. She stated that when the judge noted that the petitioner had AIDS many prospective jurors became nervous, did not want to serve on the jury, and were excused by the court. She also stated that after being sworn to serve on the trial jury, more than one juror expressed the view that if they had known of the petitioner's condition they would not be on the jury, they were uncomfortable, and would have tried to be excused from serving. While the trial was taking place, and before deliberations, Ms. Winn heard comments from spectators concerning the petitioner as she was entering the courthouse in the morning. She heard a rumor that he had been dating the victim. She testified that she had been aware that the victim's family was CT Page 7939 very angry, that they were taunting and jeering as the petitioner was brought into court. She noted that there were four or more sheriffs in the courtroom, all wearing latex gloves.
Ms. Winn said she had no recollection of any juror ever bringing up any fact or allegation not part of the trial testimony. She did, however, recall seeing a stick figure with a noose around its neck drawn on the blackboard in the jury room the second day after the jury was sworn. The existence of this figure was brought to Ms. Winn's attention by another juror who stated to her that she wished someone would get rid of the picture. From her perspective, Ms. Winn thought she was looking at a man with a noose around his neck, and she stated that she thought that perhaps someone was trying to, "give you an idea." Ms. Winn did not know how long the stick figure had been present before it was erased. Nor did she have any idea who drew it on the blackboard. She assumed, however, that it was placed there for the jurors to see it.
Also testifying at the habeas hearing was juror Leslie Foster, now Schriefer. Ms. Schriefer stated that during the trial, on one occasion while she was using a toilet stall in a women's public restroom, a member of the media placed a microphone under the stall door, attempting to interview her. She told the reporter she had no comment, and she reported this event to another juror. She recalled that the sheriffs were wearing latex gloves in the courtroom. She related that during one lunch break in the trial, while she and two other jurors were seated in a public restaurant, members of the victim's family took seats at an adjacent table, and members of the petitioner's family took seats at another-nearby table. Each group, she stated, was talking very loudly, with the victim's family stating that the jurors better find the petitioner's family guilty, and the petitioner's family stating that they'd better find him not guilty. Ms. Schriefer testified that, feeling intimidated and fearful that the families might become more excited, the threesome cut their lunch short and left the restaurant. Ms. Schriefer stated that they did not report this incident to anyone.
Ms. Schriefer also stated that during an afternoon trial recess, she observed the petitioner enter the jury deliberation room. This room, she stated, was adjacent to and visible from the courtroom, and it contained a bathroom. It was the juror's impression that the petitioner had been taken there to utilize CT Page 7940 the bathroom facilities. After the petitioner left the jury room, the jurors entered, and one jury member used the bathroom. Another juror, however, said that she would not use the bathroom, that she was afraid to use it because the petitioner had just used it. Ms. Schriefer assumed that the other juror's fear was based on the petitioner's medical condition. Ms. Schriefer also testified that she observed a drawing of hangman on the jury room blackboard after the petitioner had been in the room. To her it appeared that someone had played the hangman game. Beneath the figure she observed the words, "hang me". She testified that there was no discussion among the jurors concerning this figure, and that one of the jurors erased the figure. In response to questioning from the court, juror Schriefer stated that when she saw the figure, she thought someone was crying for help. She thought the words, "hang me" had been written by the petitioner, and that he was crying for help. At the habeas hearing the petitioner testified credibly that he did not draw anything on the blackboard in the jury deliberation room.
During his habeas testimony, Attorney Rosenblum said that he had a vague recollection of learning during the trial that someone had drawn a stick figure on a gallows on a blackboard in the jury room. He thought the sheriff in charge of tending the jury had reported this incident to the Judge Dean in the courtroom, that one morning the sheriff told the court that he found the stick figure on the blackboard, and that the court ordered it removed. He testified that he knew the stick figure had been erased, or at least he assumed it had been erased based on Judge Dean's order. Attorney Rosenblum made no requests to the court concerning the stick figure. The court did not address the issue with any jury members. Nor did the court take testimony from anyone in regard to the presence of a stick figure on the jury room blackboard.
From the different descriptions given of the stick figure by the two testifying jurors, and the testimony by one juror that another juror erased the stick figure, the court is not able to determine whether one or two stick figures were drawn on the jury room blackboard. The court does note, however, that neither juror who testified at the habeas hearing reported seeing more than one such figure.
Throughout the trial, the petitioner was escorted daily from the Stamford Police Station to the courthouse by sheriffs and police officers. While this procedure was routine during this CT Page 7941 time period because of the absence of a lock-up in the courthouse and the close proximity of the police station to the courthouse, the court credits the testimony of the petitioner, and one of the news reporters who covered the trial, that the petitioner was escorted by both sheriffs and Stamford police officers on his walk from the station to the courthouse, and this procession was observed by many spectators, some of whom made derogatory comments to the petitioner.
While the issue of AIDS was not raised by either counsel during the evidentiary portion of the trial once the jury was selected, in his summation to the jury, Attorney Hudock stated as follows:
"During the course of your deliberations as I indicated to all of you, during the question and answer period we had at the beginning of this trial, your deliberations are solely to involve the issue of guilt or innocence of the accused.
The defendant is not exposed to a death penalty here which you are not to consider any possibility of a sentence at all as a result of your verdict. The Judge will tell you that that's his job.
So, please stick to that, guilt or innocence based upon what you've heard from the witness stand.
I'll also indicate to you — the Judge is going to indicate to you that your sympathies shouldn't be involved one way or another during the course of your deliberations. And sympathy would necessarily involve what you know about the defendant's physical; condition. That is not to be a part of it, or your deliberations.
It's been mentioned before and I felt I had to mention it again. It is not part of this trial as we told you from the beginning and it should remain outside of this trial." Petitioner's Exhibit 1, Trial Transcript, 495 (September 28, 1985)
The petitioner asserts in Counts One and Two that, from the totality of these circumstances, the court should conclude that the trial was conducted in an inherently prejudiced atmosphere, or that there was actual jury prejudice against the petitioner which deprived him of a fair trial. CT Page 7942
In the Amended Return as to Counts One and Two, the respondent alleges that the petitioner's claim that he was denied a fair trial has already been decided on appeal. Alternatively, the respondent claims that the petitioner's assertion that he was denied a fair trial was not raised at trial or on appeal, and he is therefore procedurally barred from asserting this claim through collateral habeas attack. The respondent asserts that the petitioner has not shown requisite cause and prejudice to elude procedural default. The petitioner claims, however, that he has not previously asserted the factual and legal grounds upon which Counts One and Two are based, and he further claims that he was prevented from asserting these grounds on direct appeal because "many of these underlying facts are outside that record, because of ineffective assistance of trial counsel, or, in the alternative, because trial and appellate counsel could not, with reasonable diligence, have discovered all the facts underlying this claim." cf. Third Amended Petition dated March 3, 1997, Count One, Paragraph 36, and Count Two, Paragraph 36.
On direct appeal, the petitioner claimed that the trial court violated his constitutional right to a fair trial by disclosing to all prospective jurors that he had AIDS. In disposing of this claim, the Supreme Court, which had the benefit of the record of the underlying proceedings, stated,
"Moreover, review of the voir dire of the jurors who found the defendant guilty leads us to conclude that they were not biased against him because of his medical condition. Several volunteered that they believed that the issue is wholly irrelevant to the question of the defendant's guilt. One juror expressed sympathy toward the defendant. Another pointed out that the defendant's condition presented a greater risk to himself than to the jurors. Defense counsel chose not to pursue further the state of mind of a third juror, who, while asserting that the defendants' illness was not a factor, admitted that she found the situation somewhat "scary." The remaining jurors stated that the defendant's condition would not affect their judgment and that they were not concerned for their own health. The record thus discloses no evidence that the jurors who sat on the defendant's case were prejudiced by the knowledge that he supposedly suffered from AIDS. On this basis, we conclude that the defendant has failed to show that actual juror bias deprived him of a fair trial." State v. Mercer, supra, 208 Conn. 62. CT Page 7943
Insight into the general community tenor about AIDS gleaned from habeas testimony and documentary evidence does not negate this conclusion already made by the Supreme Court. The petitioner adduced no further probative evidence that the jury was, in fact, predisposed to find him guilty, or unwilling or unable to follow the court's instructions as a result of being informed, and, indeed, misinformed, of his medical condition.
The petitioner claims, additionally, that the combination of events extrinsic to the trial itself operated to deprive the petitioner of a fair trial.
Historically, the writ of habeas corpus has been regarded as an "extraordinary remedy", a bulwark against convictions that violate "fundamental fairness." Brecht v. Abrahamson,507 U.S. 619 (1993). The exercise of habeas power has not been viewed as mandatory, but rather guided by equitable principles, taking into consideration various factors, including the need for finality of criminal judgments as a deterrence against crime. cf. Winthrow v.Williams, 507 U.S. 680 (1993). Consistent with this notion, our courts have determined that the standards for review in habeas jurisdiction are not the same as for direct review. Thus, issues which might entitle a criminal defendant to relief on direct appeal do not necessarily afford habeas relief. In Wainwright v.Sykes, 433 U.S. 72 (1977), the United States Supreme Court held that the failure of the habeas petitioner to make a timely objection at his state criminal trial, in accordance with state rule, to the denial of a Federal constitutional right, barred Federal habeas review of the constitutionally-based claim in the absence of a showing of cause for noncompliance with the rule, and a showing of actual prejudice. The adoption of this "cause and prejudice" requirement thus supplanted the earlier, and more petitioner-friendly rule requiring only a showing that a habeas petitioner had not deliberately bypassed the orderly process of direct appeal in order to be eligible for habeas relief. cf. Fayv. Noia, 372 U.S. 391 (1963). As a rationale for discarding the "deliberate bypass" rule and adopting the stricter "cause and prejudice" rule, the Wainwright court stated,
The reasons for our rejection of it are several. The contemporaneous-objection rule itself is by no means peculiar to Florida, and deserves greater respect than Fay gave it, both for the fact that it is employed by a coordinate jurisdiction within the federal system and for the many interests which it serves in its own right. A contemporaneous objection enables the record to CT Page 7944 be made with respect to the constitutional claim when the recollections of witnesses are freshest, not years later in a federal habeas proceeding. It enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question. While the 1966 amendment to Sec. 2254 requires deference to be given to such determinations made by state courts, the determinations themselves are less apt to be made in the first instance if there is no contemporaneous objection to the admission of the evidence on federal constitutional grounds.
A contemporaneous-objection rule may lead to the exclusion of the evidence objected to, thereby making a major contribution to finality in criminal litigation." Wainwright v. Sykes, supra,433 U.S. 88.
While the context of the decision in Wainwright was federal habeas review of state court decisions, the "cause and prejudice" rule of Wainwright has been adopted in Connecticut, and made applicable to state habeas review of criminal convictions. InJohnson v. Commissioner, 218 Conn. 403 (1991), the Connecticut Supreme Court explicitly adopted the Wainwright "cause and prejudice" rule in stating,
"The appropriate standard for reviewability in a habeas corpus proceeding of a constitutional claim not adequately preserved at trial because of procedural default is the federal "cause and prejudice" standard, which requires that a petitioner make a showing of cause for the failure to preserve the claim and a showing of prejudice."
Thus, the Johnson court declined to review the petitioners' equal protection challenges to their criminal trial jury arrays, having failed to demonstrate good cause for their failure to make those challenges prior to their trials.
While the court, in Wainwright, declined to elucidate circumstances giving rise to application of the "cause and prejudice" rule, the Wainwright court's explicit factual findings shed light on the prejudice prong. The court stated,
"Respondent has advanced no explanation whatever for his failure to object at trial, and, as the proceeding unfolded, the trial judge is certainly not to be faulted for failing to question the admission of the confession himself. The other CT Page 7945 evidence of guilt presented at trial, moreover, was substantial to a degree that would negate any possibility of actual prejudice resulting to the respondent from the admission of his inculpatory statement." Wainwright v. Sykes, supra, 433 U.S. 73.
More recently, the Supreme Court has re-affirmed this formulation of the prejudice prong. In United States v. Frady,456 U.S. 152 (1982), the court stated,
"Recently, for example, Justice Stevens, in his opinion without dissent in Henderson v. Kibbe, summarized the degree of prejudice we have required a prisoner to show before obtaining collateral relief for errors in the jury charge as `whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' not merely whether `the instruction is undesirable, erroneous, or even universally condemned.' (citation omitted) We affirm this formulation, which requires that the degree of prejudice resulting from instruction error be evaluated in the total context of the events at trial. As we have often emphasized: `[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' (citation omitted). Moreover, `a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.' (citation omitted)."
Thus, an assessment of the prejudice requirement of the "cause and prejudice" standard requires a review of the claimed deprivation in the context of the entire proceeding.
With respect to the cause prong, the Supreme Court inMcCleskey v. Zant, 499 U.S. 467 (1991) stated,
"In procedural default cases, the cause standard requires the petitioner to show that `some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court. (citation omitted). Objective factors that constitute cause include `interference by officials' that makes compliance with the state's procedural rule impracticable, and `a showing that the factual or legal basis for a claim was not reasonably available to counsel.' (citation omitted). In addition, CT Page 7946 constitutionally `ineffective assistance of counsel . . . is cause'. (citation omitted) Attorney error short of ineffective assistance of counsel, however, does not constitute cause, and will not excuse a procedural default. Once the petitioner has established cause, he must show `actual prejudice' resulting from the errors of which he complains. (citations omitted)" Id. 494.
The petitioner asserts that he is not procedurally barred from asserting the due process claims set forth in Counts One and Two because his failure to raise these issues at trial or on appeal did not violate any specific rule of court or statute, and that procedural default comes into play only upon a showing that a petitioner has failed to comply with a mandatory rule of procedure applicable at trial or on direct appeal. The court disagrees. While the specific holding of Wainwright turned on the failure of the petitioner to comply with a Florida rule requiring contemporaneous objections to evidence based on a constitutional claim, it is apparent that the reasoning underlying this holding is that counsel should not be permitted a relaxation of diligence in order to preserve for habeas review an objection which should more properly have been made at trial when the court would have had the opportunity to take corrective action. The court disagrees with the petitioner's claim that the holding ofJohnson, embracing the federal "cause and prejudice" standard, is applicable only when it can be shown that the petitioner violated a mandatory procedural rule implicating a claimed constitutional right.
Since Connecticut has adopted the federal "cause and prejudice" rule as its own, it is instructive to refer to Federal consideration of the rule. In Murray v. Carrier, 477 U.S. 478
(1986) the court discussed the rationale for the rule. The court stated:
"That standard rests not only on the need to deter intentional defaults but on a judgment that the costs of federal habeas review `are particularly high when a trial default has barred a prisoner from obtaining adjudication of his constitutional claim in the state courts.' Engle,456 U.S., at 128. Those costs, which include a reduction in the finality of litigation and the frustration of `both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights,' ibid., are heightened in several respects when a trial default occurs: the default deprives the trial court of an opportunity to correct any error without retrial, detracts CT Page 7947 from the importance of the trial itself, gives state appellate courts no chance to review trial errors, and `exacts an extra charge by undercutting the State's ability to enforce its procedural rules.' Id. at 129." 477 U.S. 478, 487 (1986).
If the court accepted the petitioner's assertion that procedural default only operates when a trial defendant has violated a mandatory rule of procedure, then it would be wise for defendants, whose trials are running afoul, to forebear from making claims or objections intended to right the trial process, knowing that they may thereby be precluded from review on direct appeal, in the expectation that their constitutional claims may be aired, for the first time, at a habeas trial, the timing of which is not prescribed by any statute of limitations. To make habeas review available under such circumstances would not only demean the Great Writ but would render less meaningful trial court procedural rules intended to enhance the orderliness of trial proceedings, safeguard the fairness of the process, and to provide a framework for appellate review.
While the court has discovered no appellate decisions on the precise issue of whether the "cause and prejudice" rule should be applied in habeas only where the petitioner has failed to comply with a mandatory rule of procedure, this court's view is consistent; with numerous appellate opinions containing factual histories involving counsels' failure to preserve claims which could have been made at trial. For example, in McIver v. Warden,28 Conn. App. 195 (1992), the Appellate Court noted that, "A review of the habeas record reveals that the petitioner failed to demonstrate any reason why the prosecutor's remarks and the jury instructions were not previously challenged . . . We see no reason why the petitioner could not have advanced this constitutional claim at the time of the appeal's. Similarly, in a case involving issues of severance and a failure to object to identification testimony at trial, the court, in Daniels v.Warden, 28 Conn. App. 64 (1992) stated, "The petitioner must show good cause for his failure to preserve a claim at trial and actual prejudice resulting from the alleged constitutional violation."
This court sees no generic dissimilarity warranting disparate application of the "cause and prejudice" rule between counsel's failure to object to identification testimony on one hand, and counsel's failure to move that a hearing be closed, to seek a mistrial, or to have counsel and witnesses ordered to refrain CT Page 7948 from commenting on the case.
Also, Connecticut appellate discussion of the "cause and prejudice" rule does not include the provision that it applies only when a petitioner has failed to comply with a mandatory trial procedure rule. Thus, in Bowers v. Commissioner, the Appellate Court noted that, "The cause and prejudice standard, however, is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertance or ignorance." cf. also Baez v. Commissioner, 34 Conn. App. 236 (1994). Also, inStovall v. Commissioner, 43 Conn. App. 552 (1996), the Appellate court affirmed the decision of a habeas court that a petitioner who chose not to pursue a motion to suppress statements he made to an arresting officer on the basis of a Miranda violation in order to gain a tactical advantage at trial was barred from habeas review of the voluntariness of the confession.
Several of the due process violations alleged by the petitioner in Counts One and Two were known to counsel at the time and could have been addressed in accordance with the (then) applicable rules.[4]
With respect to the presence of four or more sheriffs in the courtroom wearing latex gloves, counsel had the opportunity to observe these circumstances and to ask the court, in its supervisory capacity, to take remedial action.
Similarly, with respect to pretrial publicity, it is clear from a review of the newspaper articles presented at the habeas hearing, that the State's Attorney, defense counsel, and the petitioner all spoke to the press. Should Attorney Rosenblum have wished a change of venue, P.B. § 809 and P.B. § 835, the applicable rules then in effect, set forth the required procedure. Also, counsel had the opportunity, pursuant to P.B. § 887 to move, at any time during the trial, for a mistrial for an occurrence or conduct inside or outside the court room which counsel believed may have resulted in substantial and irreparable prejudice to the petitioner. Thus, upon learning that a stick figure had been drawn on the jury room blackboard, counsel could have either asked the court to conduct a voir dire examination of the jury, and/or could have sought a mistrial based on a claim of irreparable prejudice to the petitioner. Counsel had the right, too, pursuant to P.B. § 894 to seek an order from the court to both counsel and any witnesses CT Page 7949 prohibiting any extra-judicial statements concerning the proceedings, and counsel had the right, pursuant to P.B. § 895, to request that the August 6, 1985 medical hearing be closed to the public. Finally, counsel had the right, pursuant to P.B. § 902, to move for a new trial. Counsel's failure to avail himself of these remedial measures does not constitute "cause" for purposes of eluding procedural default. cf. Engle v. Isaac,456 U.S. 107 (1982)
The court finds, however, that the petitioner did not know at the time of trial that members of the jury were discussing his medical condition, and their perceptions of it, among themselves during his trial. Nor did counsel know that three jurors had been verbally accosted at lunch by members of both the victim's and the petitioner's families. Counsel did not know either that one juror had been subjected to an effort by the media to interview her during the trial.
The petitioner has provided no basis, however, for the court to conclude that this information was not reasonably available to him within the time period for filing a petition for a new trial pursuant to C.G.S. § 54-270. This petition was originally filed on December 23, 1988. It contained no allegations related to jury impropriety or impermissible contacts with the jury. In a Two Count Amended Petition dated May 3, 1991, the petitioner alleged that he was denied the effective assistance of trial and appellate counsel. This document contained no claim of jury impropriety or of impermissible external contacts with the jury. The petition was dismissed by the court on the basis that the Supreme Court, on appeal from the conviction, had determined that the petitioner had not been denied a fair trial. Subsequently, the Supreme Court reversed the habeas court, stating that the petitioner had the right to an evidentiary hearing on his habeas claims. cf. Mercer v. Commissioner, 230 Conn. 88 (1994). The matter was remanded to the habeas court for trial.
Thereafter, by pleading dated May 8, 1996, the petitioner filed a Revised Amended Petition containing six counts, none of which addressed the issue of jury impropriety or external communications to the jury. The Third Amended Petition dated March 3, 1997, for the first time, set forth factual claims relating to possible juror impropriety and external communications to the jury.
Notwithstanding the substantial delay in raising these CT Page 7950 issues, and the absence of a showing that the information in support of these claims, i.e., the testimony of two jurors, was unavailable within time to file a petition for a new trial, the court reviews the petitioner's claims of jury impropriety and external communications to the jury because of their constitutional magnitude.
The court finds that jury members did, in fact, discuss their views concerning the petitioner's medical condition during the course of the petitioner's trial. The court also finds that, during a trial recess, a reporter attempted to interview one juror by placing a microphone under a toilet stall door, that three jurors were briefly exposed to heated discussion from both the victim's and the petitioner's families during lunch at a public restaurant, and that someone placed a stick figure of a person hanging on the blackboard in the jury room during the evidence portion of the trial.
With respect to the basic right of one criminally accused to a jury trial, the United States Supreme Court has stated:
The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial `indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. (citations omitted) `A fair trial in a fair tribunal is a basic requirement of due process.' (citation omitted) In the ultimate analysis, only the jury can' strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as `indifferent as he stands unsworne.' (citation omitted) His verdict must be based upon the evidence developed at the trial. (citation omitted) This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 . . .' (citation omitted)" Turnerv. Louisiana 379 U.S. 466, 472 (1965).
Commenting on the issue of pretrial publicity in the context of a fair trial discussion, the Supreme Court earlier opined,
"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified CT Page 7951 to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (Citations omitted) Irvin v. Down,366 U.S. 717 (1961).
While evidence at the habeas trial that some of the jurors discussed the petitioner's medical condition tends to demonstrate that at least some of them had concerns related to the communicability of the petitioner's disease, the court will neither imply nor infer from the habeas evidence that such concerns bore on the impartiality of the jury in deciding the issue of the petitioner's guilt.
A reporter's attempt to interview a juror, the drawing of a stick figure on the jury room blackboard (unless done by a juror), and the heated exhortations from the victim's and petitioner's families to three jury members all represent extrinsic influences on the jury. When an extrinsic contact with a jury occurs, jury prejudice is presumed. This is based on the notion that, "Private communications, possibly prejudicial, between jurors and third persons . . . are absolutely forbidden and invalidate the verdict at least unless their harmlessness is made to appear." Mattox v. United States, 146 U.S. 140, 150
(1892). In citing Mattox, the United States Court of Appeals (11th Circuit) stated,
"More recently, the Court reaffirmed this rule with emphatic clarity:
"In a criminal case, any private communication [or] contact . . . directly or indirectly, with the juror during a trial about the matter pending before the jury is for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. Remmer v. United States, 347 U.S. 227,229 (1954)" United States v. Martinez, 14 F.3d 543, 550 (1994).
This presumption of prejudice may be rebutted, however, by a CT Page 7952 showing that the jury's consideration of the external communication was harmless. In making this evaluation, the court may consider the quality of the evidence properly admitted to the jury. In United States v. Weiss, 752 F.2d 777 (1985), the Court opined,
"This presumption may be rebutted, however, by an affirmative showing on the part of the government that the information was harmless. (citation omitted) The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter . . . but the nature of what has been infiltrated and the probability of prejudice (citations omitted)."
The court continued,
"The trial court should assess the `possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware. (citation omitted) The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists (citations omitted)." Id.
In this case, while the court abhors the drawing of the stick figure on the jury blackboard, the potential impact of seeing it must be evaluated in the context of the strength of the State's case. The same is true of the restaurant encounter. Making this analysis, it is the court's determination that the evidence against the petitioner was overwhelmingly strong, thereby reducing the risk that these external contacts may have influenced the jury's verdict. The abundance of evidence pointing to the petitioner's guilt negates the presumption that these extrinsic communications may have affected jury decision making. In United States v. Olano, 507 U.S. 725 (1993), the Supreme Court opined,
"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial CT Page 7953 judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."
To the extent that some of these occurrences may not have come to the attention of counsel, the petitioner has nevertheless failed to demonstrate actual prejudice. In this regard, the court finds that the trial evidence of the petitioner's guilt was overwhelming. Not only did the state have the petitioner's detailed and explicit post Miranda confession, but the petitioner's statement was corroborated by the trial evidence of his sister, the forensic evidence concerning the gun and bullets, and the testimony of Virginia authorities who discovered the petitioner asleep in the back seat of the victim's automobile.
As a safeguard against an unjust conviction, the United States Supreme Court has adopted a refinement of the "cause and prejudice" rule for situations in which it would be a fundamental miscarriage of justice to refuse to hear a habeas petition on the basis of procedural default. cf. McCleskey v. Zant, 499 U.S. 467
(1991). Thus, in McCleskey, the court stated that, "If petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim." Id. 495. While, in McCleskey, the court was considering the issue of successive habeas petitions, the court explicitly made the "cause and prejudice" rule equally applicable to successive habeas petitions as well as to petitions filed after conviction. Murray v. Carrier, supra, 477 U.S. 478 (1986). In both McCleskey, and later in Schlup v. Delo, 513 U.S. ___ (1995), the Court defined the fundamental fairness exception to the cause and prejudice standard as requiring a showing of actual innocence. Cf. also, Sawyer v. Whitley, supra, 505 U.S. 333. With respect to the petitioner, where the evidence of his guilt was pervasive, this exception is inapplicable.
For the reasons stated, the petitioner is procedurally defaulted on the claims set forth in Counts One and Two.
In Counts Three and Four the petitioner alleges that he was denied the effective assistance of counsel.
In order for the petitioner to succeed in his claim that he was denied the effective assistance of counsel in the criminal proceedings, he has the burden of proving both that his trial counsel's performance was deficient and that he was actually CT Page 7954 prejudiced by his counsel's deficient performance. Strickland v.Washington, 466 U.S. 668 (1984), Bunkley v. Commissioner,222 Conn. 444 (1992), Copas v. Commissioner, 234 Conn. 139 (1995).
The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the Federal constitution and by Article First, Section 8 of the Connecticut constitution. In order to prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352 (1989). Competent representation is not to be equated with perfection. "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." Jeffrey v.Commissioner, 36 Conn. App. 216 (1994) (citations omitted). "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotations marks omitted.) Johnson v. Commissioner,36 Conn. App. 695 (1995).
The Strickland court also gave guidance to the trial bench for its assessment of ineffective claims. The Supreme Court opined:
"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy'. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted.) Strickland v.CT Page 7955Washington, supra, 466 U.S. 689-90; Quintana v. Warden,220 Conn. 1 (1991); Williams v. Warden, 217 Conn. 419 (1991); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
With respect to the prejudice component of the Strickland
test, the petitioner must demonstrate that, ". . . counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v.Washington, supra 466 U.S. 687. Thus, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." Id., 693. Rather, a successful petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner, 234 Conn. 139 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome."Strickland v. Washington, supra 466 U.S. 694. "`When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'"Fair v. Warden, 211 Conn. 398, 408 (1989); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994). Additionally, the court need not determine the deficiency of counsel's performance if consideration of the prejudice prong will be dispositive of the ineffectiveness claim. Aillon v. Meachum, 211 Conn. 352 (1989);Harris v. Commissioner, 40 Conn. App. 250 (1996).
The petitioner alleges that counsel failed to object to the public nature of the August 6, 1985 medical hearing, failed to adequately inform himself concerning the disease, failed to discuss a strategy for handling the issue with the petitioner, failed to object to the court's public disclosure of his condition to the venire, failed to ask that the proceedings be closed, failed to object to the mis-characterization of the petitioner's medical condition as AIDS, failed to conduct a proper voir dire, failed to object to the sheriffs wearing latex gloves, failed to object to Attorney Hudock's mention of AIDS to the jury in closing argument, and failed to request a limiting instruction to the jury not to consider the petitioner's medical consideration, the courthouse atmosphere, or any external contacts in their deliberations. CT Page 7956
With respect to the issue of the public medical hearing, Attorney Rosenblum agrees that he did not object to the hearing; nor did he object to the fact that it was conducted publicly. As to his testimony that Judge Dean was determined to conduct the hearing, and that any objection to it would have been futile, the perceived futility of objecting to a court ruling or procedure is not an adequate justification for failing to assert and protect a criminal defendant's rights.
With respect to the public nature of the hearing, the court finds that, pursuant to P.B. § 895, then in effect, counsel could and should have requested the court to close the hearing to the public.
With respect to the medical hearing, the court finds, however, that the petitioner has failed to establish that he was "prejudiced" by the public revelation of his medical condition. A review of answers provided on voir dire discloses that the jurors who were actually selected, when questioned about the petitioner's condition, either had no knowledge of it, felt it had nothing to do with the case, felt no discomfort relating to it, or felt some sympathy for a person afflicted with the disease. Jurors who expressed concern with it were systematically excluded for cause, and the court granted counsel extra peremptory challenges upon request.
With respect to the actual voir dire questioning, while the court recognizes that counsel did not pursue every partial answer, that counsel's questions did not, at all times, maximize the opportunity for exploration, and that counsel's questioning did not disclose a highly developed understanding of AIDS, the court-finds that the questions intended to elicit information concerning possible juror bias or taint were reasonable and adequate to ferret out any biases or perceptions which may have predisposed any potential jurors against the petitioner.
The petitioner has failed to educe any probative evidence that better consultation with him by counsel in conjunction with the AIDS issue, or an enhanced understanding of AIDS by counsel would have resulted in a more probing voir dire process, or would have decreased the likelihood of the court informing the venire about his medical condition. Additionally, the petitioner has failed to demonstrate that he was prejudiced by the fact that the court misinformed the panels by stating that the petitioner had "AIDS" instead of more accurately reporting that he was a carrier CT Page 7957 of the virus, that he was infected with the HTLV-3 Virus-ARC. While this distinction was clearly lost on the print media, and blurred by the Assistant State's Attorney in his voir dire questioning, it is the court's conclusion that the habeas evidence has failed to demonstrate that the jury was either predisposed against the petitioner as a result of the AIDS disclosures before the trial, or influenced against him in their deliberations as a result of any information concerning the petitioner's condition seeping into the jury room during the trial process.
It is evident that counsel did not object to the sheriffs wearing latex gloves during the trial. As a general proposition, and without regard to present Practice Book provisions, when the State takes extra precautions during a criminal trial, such as requiring a defendant to wear prison clothes, or to be manacled, such practices must be subjected to "close judicial scrutiny."Estelle v. Williams, 425 U.S. 501; Holbrook v. Flynn,475 U.S. 560 (1986). Such practices, which may be viewed as inherently prejudicial, may be justified only upon a showing of an "essential state policy." Estelle v. Williams, supra,425 U.S. 504-505. In this case, the respondent has identified no essential state policy that was served by having the sheriffs wear latex gloves. To the contrary, a fair reading of Dr. Blanchette's testimony at the time would have supported the conclusion that no particular precautions relating to the petitioner's condition were necessary. Counsel could have objected to the wearing of gloves by the sheriffs, and should, in the exercise of reasonably effective advocacy, have asked the court, in the exercise of its-supervisory authority over the sheriffs in the courtroom, to direct the sheriffs not to wear gloves in the presence of the jury. The petitioner has failed to show, however, that the presence of sheriffs in the courtroom wearing latex gloves contributed to the jury's determination of the petitioner's guilt. Nor may such a conclusion be inferred. Even an assumption that some of the jurors who noticed the gloves believed that the sheriffs were wearing them for protection does not lead the court to the belief that the observing jurors drew a connection between the sheriffs' need for protection from the spread of AIDS and the jury's determination of the petitioner's guilt. While the court credits the expert testimony that AIDS was a heavily stigmatized disease in 1985, this factor does not counterbalance the fact that the State's case against the petitioner was extraordinarily strong. Nor does it permit the inference that the Mercer jurors were influenced by the presence of extra sheriffs wearing latex CT Page 7958 gloves to find the petitioner guilty.
While not specifically framed in the pleadings, it became evident during the habeas trial that counsel learned, during the criminal trial, that a stick figure resembling a hang man had been drawn on the jury room blackboard, and that counsel sought no remedial response from the court. While not specifically alleged as an act of ineffectiveness on the part of counsel, the court finds, based on the evidence of his actual awareness of this occurrence, that he should have sought relief from the court. In this regard, there were various options available to counsel. He could have asked the court to question the sheriff and members of the jury to ascertain the extent of this intrusion, and to learn, possibly; the source of the stick figure. Depending on what had been learned at such an evidentiary procedure, he could have asked the court to issue cautionary instructions to the jury, or he could have sought a mistrial. Counsel's failure to seek any remedial relief was ineffective. The petitioner has failed, however, to demonstrate that the jury's determination would have been different had none of them been exposed to a stick figure. Counsel's failure to seek remedial measures from the court did not, in light of the strength of the state's case, prejudice the defendant, as the term "prejudice" is utilized in a Strickland determination.
With respect to the claim that counsel failed to object to Attorney Hudock's mention of AIDS in closing argument, the court finds that, when viewed in the context of-his general admonition to the jury to consider only the evidence, the mention of AIDS was neither objectionable nor inappropriate. It is clear from a reading; of the voir dire transcript as well as this portion of closing argument, that Attorney Hudock was concerned lest the jury be sympathetic to the petitioner on account of his medical condition, and not that he was attempting to sway them against the petitioner's on this basis.
With respect to the petitioner's claim that counsel was ineffective for not asking the court for an instruction to the jury that they should not consider any external contacts, the courthouse atmosphere, or the petitioner's condition in their deliberations, the court gave a general instruction concerning probative evidence that encompassed these areas. While not tailored to the specific concerns voiced by the petitioner, the court's instructions were proper and adequate. CT Page 7959
The petitioner also claims that counsel was ineffective for his failure to request an appropriate instruction concerning circumstantial evidence and for failing to anticipate the Supreme Court's decision in State v. Rogers, 198 Conn. 53 (1985) which was argued on October 2, 1985, and decided on December 17, 1985. While clairvoyance is not a requisite for effectiveness, a fair argument can be made that reasonable trial counsel should have been sensitive to the constitutional dimensions of this issue, and therefore, should have made a record in regard to it.
This issue can be resolved, however, by reference to theStrickland prejudice prong. The record discloses that counsel did not request a charge on this issue and that counsel did not object to the charge on circumstantial evidence given by the court. In its charge, the court instructed the jury that an inference could be drawn from circumstantial evidence so long as the fact from which an inference is to be drawn has been proved beyond a reasonable doubt and, secondly, that the inference asked to be drawn is not only logical and reasonable, but, ". . . is strong enough so that you can find that it is more probable than not that the fact to be inferred is true." Petitioner's Exhibit 1, Trial Transcript, pp. 559-560 (September 28, 1985).
In spite of counsel's failure to object to this instruction, the Supreme Court reviewed it under the rule of Evans. cf. Statev. Mercer, supra, 208 Conn. 72. While the court found the instruction faulty, the court determined that the erroneous instruction was harmless beyond a reasonable doubt because intent, often proven by circumstantial evidence and typically the focus of a circumstantial evidence charge, was not a significant issue in the petitioner trial, and that the charge, taken as a whole did not mislead the jury. The court opined,
"From our review of the record, however, we conclude that the principal factual issue at trial was not intent but identity. In addition, there was ample direct evidence of identity, including testimony from the defendant's sister, who had witnessed the crime, and the defendant's statement to the police . . . Accordingly, we consider the instructions in the context of the charge as a whole to determine `whether it was reasonably possible that the jury was misled.'
We conclude that the erroneous instruction was harmless beyond a reasonable doubt. Prior to giving the erroneous instruction, the court stressed several times that the state had CT Page 7960 a burden of proving the defendant's guilt beyond a reasonable doubt. The court; reiterated the beyond the reasonable doubt standard with regard to the elements of the offense to which that standard applied. In particular, the court stated that the jury had to find that the defendant had a requisite intent to commit robbery beyond a reasonable doubt. In this context, we conclude that it is not reasonably possible that the jury was misled as to the state's burden of proof." Id. pp. 73-74.
The Supreme Court's determination that the court's faulty charge on the topic of circumstantial evidence was harmless error under the particular circumstances of this case is instructive on the issue of prejudice. Additionally, it is the court's independent finding, based on its review of the trial transcript in conjunction with the habeas testimony, that counsel's failure to object to this charge, or failure to request a proper charge, did not bear on the jury's ultimate determination of the petitioner's guilt.
In Count Four, the petitioner claims that appellate counsel was ineffective for his failure to raise, as a distinct issue on appeal, the alleged unconstitutionality or impropriety of the August 6, 1985 medical hearing, its impact on the subsequent proceedings, or the fact that the hearing was held over objection in the absence of the petitioner.
At the habeas hearing, Attorney Thomas agreed that he did not raise any issues directly concerning the propriety of the August 6, 1985 medical hearing in his original appeal. While he could not recall his precise reasoning, Attorney Thomas stated his belief that he gave considerable thought to the question of how to deal with the "AIDS issue" on appeal, and he infers now from a review of the appeal actually filed, that he decided to approach the subject through the issue of the court's public disclosure to the venire that the petitioner "had AIDS". He did not, however, have a specific recollection of having considered and then discarding the notion of raising the issue of the August 6, 1985 hearing directly. This is an issue the court decides on theStrickland prejudice prong. It is the court's view that the petitioner has failed to established that the injection of AIDS into his criminal trial made its outcome unreliable. While AIDS had a presence during the trial, the court is unpersuaded, in light of the strength of the inculpatory evidence against the petitioner, that the AIDS factor influenced the jury's determination of guilt. Therefore, the court does not find any CT Page 7961 likelihood that reasonable men and women, serving as jurors in the Mercer trial, would have come to a different conclusion regarding the petitioner's guilt assuming that there had been no mention of AIDS to any of them at any time relevant to the proceedings.
As noted by the court, there were errors of a professional magnitude committed by counsel during the petitioner's criminal trial, but on the basis of the strength of the evidence properly before the jury, the court is unpersuaded that, absent counsel's errors, the results of the trial would have been any different. Cf. Commissioner v. Rodriguez, 222 Conn. 469 (1992); Bunkley v.Commissioner, 222 Conn. 444 (1992). For the reasons stated, the petition is dismissed.
Bishop, J.